[No. 48973-4.   En Banc.   August 2, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. FORTUNATO L. DICTADO, *Appellant.*

*Fortunato L. Dictado, pro se, Browne, Ressler & Foster,* and *John Henry Browne, for appellant.*

*Norm Maleng, Prosecuting Attorney,* and *Joanne Y. Maida, Senior Deputy,* for respondent.

DIMMICK, J.—Defendant Dictado appeals his conviction for noncapital aggravated first degree murder. He raises numerous issues, but primarily argues that the trial court erred in allowing the use of conspiracy evidence at trial when conspiracy was not charged. Among his other issues, he objects to the admission of a critical prosecution witness's prior consistent statements. He protests the use of his own statements made prior to arrest and his testimony from a previous trial of other defendants. He also challenges the constitutionality of the mandatory life sentence required under RCW 10.95.030. We reject these assignments of error, as well as the others he raises, and affirm the conviction.

I

On June 1, 1981, two members of the Cannery Workers Union were killed at the union hall. One victim lived long enough to identify three union members, Ramil, Guloy, and Peli, as the perpetrators of the shooting. Within several days, police learned that witnesses had seen a black uniquely marked Trans Am automobile in the area of the killing on the day in question. Further investigation revealed that at least three persons with possible union connections owned similar cars. One of these was defendant.

On June 16, two Seattle police detectives stopped defendant on the street and told him that they would like to talk to him about the killings. He agreed to accompany them to their offices where he remained for approximately 1 hour. At that time, the investigation had disclosed between 10 and 20 potential suspects, most of whom were being questioned by the police. The police did not have probable cause to arrest defendant on June 16, and did not,

at any time, give him *Miranda* warnings. Both officers testified that had defendant refused to discuss the killings with them, they could not have held him.

Two of the identified men, Ramil and Guloy, were tried and convicted of the murders. At their trial, defendant was brought to court on a material witness warrant. The arresting detective testified that he gave defendant complete, verbal *Miranda* warnings at that time. In his testimony, defendant described his connection with a group called "Tulisan", and provided exculpatory testimony for Ramil and Guloy, including an alibi. Defendant was released at the conclusion of his testimony. During that trial, defendant's attorney was also the defense attorney who represented Ramil.

Two weeks after this testimony, defendant was charged with two counts of aggravated first degree murder. The attorney's representation was found to raise a potential conflict of interest, and Dictado was required to retain different counsel for his own trial.

In charging defendant with aggravated murder, the statutory aggravating factor relied on by the State was the killing of more than one victim as "part of a common scheme or plan or the result of a single act of the person". RCW 10.95.020(8). The State did not seek the death penalty.

Witnesses at defendant's trial testified that defendant was the leader of the Tulisan, and that Ramil and Guloy were members. The Tulisan protected and received profits from a gambling operation located in Seattle's International District. They intended to expand this activity to Alaska during seasonal cannery operations. In order to control the gambling activities in Alaska, it was necessary for the Tulisan to have several members sent to Alaska through the union dispatch system. Some time prior to the killings, the dispatch system had undergone reforms. The reforms included abolishing the former bribery and patronage dispatch system, and establishing a seniority system based on prior cannery employment. Under the new system, the Tulisan was unable to get any members dispatched to

Alaska. The two men killed were the vanguard of the reform movement, one of whom was the new dispatch officer.

In addition to the Tulisan gambling connections and the reform of the union dispatch system, the State presented evidence that defendant threatened the new dispatch officer, that he met with union president Baruso 2 days before the killing, and that the murder weapon was registered to union president Baruso. Witnesses testified that they saw defendant driving his car near the union hall several times on the day of the killings. Under the coconspirator exception, the State introduced statements made by Ramil and Peli implicating defendant in the planning and execution of the murders. Baruso testified, giving little more than his name and occupation and otherwise invoking the Fifth Amendment to all other questions. The State also introduced statements made by defendant during his interview with the police on June 16 and portions of his prior testimony at the Ramil–Guloy trial.

Defendant was found guilty as charged, and sentenced, under the statute, to life in prison without possibility of parole.

## II
### THE STATE'S USE OF CONSPIRACY EVIDENCE

Defendant's main contention is that the State's theory, murder committed in order to advance a gambling scheme, forced him to defend against an uncharged criminal conspiracy, deprived him of notice of the charges, and allowed the State to use coconspirator's statements in violation of his confrontation rights. We discuss his various arguments below.

### A
### Admission of Coconspirator Statements

Defendant contends that the trial court abused its discretion in admitting coconspirator statements under ER 801(d)(2)(v). Specifically, he asserts that unless conspiracy is charged in the information, coconspirator statements are

inadmissible. We hold otherwise.

By its terms, ER 801(d)(2)(v) does not restrict its application only to criminal cases in which conspiracy has been charged.[1] Prior to the rule, the availability of the coconspirator exception did not depend on whether a criminal conspiracy was charged. *State v. Wappenstein,* 67 Wash. 502, 121 P. 989 (1912). Under the federal rule comparable to ER 801(d)(2)(v), the federal courts uniformly allow admission of coconspirator statements in criminal cases, whether or not conspiracy has been charged. *See, e.g., United States v. Lutz,* 621 F.2d 940 (9th Cir.), *cert. denied,* 449 U.S. 859 (1980); *United States v. Lyles,* 593 F.2d 182 (2d Cir.), *cert. denied,* 440 U.S. 972 (1979); *see generally* Annot., 44 A.L.R. Fed. 627 (1979).

Defendant implies that *State v. Goodwin,* 29 Wn.2d 276, 186 P.2d 935 (1947) overruled *State v. Wappenstein, supra.* The issue in *Goodwin* was the admission, in a joint trial, of a codefendant's written confession apparently made after his arrest. Despite ambiguous language, the holding does not apply to coconspirator statements made during the course and in furtherance of the conspiracy. ER 801(d)(2)(v) is entirely consistent with the concerns in *Goodwin* that statements made after the conspiracy has ended should not be admitted.

Defendant further argues that the trial court erroneously found a prima facie case of conspiracy, failed to find that the statements were made during the course and in furtherance of the conspiracy, and failed to determine that the declarants were members of the conspiracy. The record belies defendant's contentions.

The general rule is that prior to admitting coconspirator statements, the trial court must determine whether the State has shown, with substantial independent evi-

---

[1] ER 801(d) provides in part:

"A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

dence, a prima facie case of conspiracy, and at least slight evidence of defendant's participation. *United States v. Fleishman,* 684 F.2d 1329 (9th Cir. 1982). A conspiracy may be shown by circumstantial evidence if, in the opinion of the trial court, it tends to establish the fact of conspiracy. *State v. Culver,* 36 Wn. App. 524, 675 P.2d 622 (1984). During the pretrial hearing in this case, the trial court indicated the independent evidence upon which it relied. The court found that substantial evidence, independent of the statements, showed the existence of a conspiracy to promote gambling.

Defendant's remaining claims are similarly meritless. The record indicates that the trial court, on several occasions, was concerned with establishing that the conspiracy was still ongoing after the killings, and had not yet ended when the statements were made. The trial court found that the coconspirator statements furthered the continuing conspiracy because they were implied threats made in connection with collecting the gambling proceeds. On several occasions during the offer of proof, the court requested and was given information regarding each alleged conspirator's involvement in the conspiracy. We find no abuse of discretion in admitting the coconspirator statements.

## B
### Whether the State Gave Adequate Notice of the Charge

Defendant next argues that failure to charge a criminal conspiracy denied him notice of the charges against him. He further argues that the vagueness of the phrase "single act" in RCW 10.95.020(8) denied him proper notice of the charges. In a related assignment of error, he asserts that the trial court abused its discretion in denying his motion for a bill of particulars. The main thrust of defendant's argument is that although he was charged with murder, the State proceeded to prove a conspiracy to promote gambling, against which defendant was compelled to defend.

An accused has a due process right to know the

charge he must defend against at trial; he cannot be tried for an unstated offense. *State v. Carr,* 97 Wn.2d 436, 647 P.2d 1098 (1982). Here, the State charged aggravated first degree murder, specifically relying on the aggravating factor of the killing of more than one victim as part of "a common scheme or plan or the result of a single act of the person". RCW 10.95.020(8). Thus, the information gave notice that the State would be seeking to prove, among other things, that multiple victims were killed for the same reason—in this case, to advance a gambling scheme. *State v. Grisby,* 97 Wn.2d 493, 647 P.2d 6 (1982) ("common scheme" involves a nexus between the killings), *cert. denied,* 459 U.S. 1211, 75 L. Ed. 2d 446, 103 S. Ct. 1205 (1983).

The "scheme" that the State must prove may or may not amount to a criminal conspiracy. What is important to defendant is whether adequate notice was given of the State's theory of the nexus between the killings. We find adequate notice. The State's theory was that the advancement of defendant's gambling interest was the motive for the killings. It was identical to that used in the Ramil–Guloy trial. Defendant was aware of the theory, was given a complete transcript from the first trial, and the issue of the "common scheme" was briefed and argued for various pretrial hearings. In both arguments, on the issue of notice and for a bill of particulars, defense counsel indicated that he understood the State's theory that the two murders were the result of a scheme to advance gambling. Defendant has not shown that the failure to allege a criminal conspiracy resulted in lack of notice.

For similar reasons, we reject defendant's contention that the allegation under the "single act" portion of the statute deprived him of notice. Defendant argues that he could not defend against the charges because he had no notice of what act was prohibited or what act the State would rely on to satisfy the statute.

Again, we cannot find that the State's theory was concealed from defendant. He was aware that the deaths resulted from the acts of the two previously convicted

defendants. He knew that the State sought to prove his participation as an accomplice to the killings. He does not contend that he was prevented from defending against the State's accomplice liability theory. The jury was given the standard pattern criminal instruction regarding accomplice liability. Defendant assigns no error to the giving of this instruction, or to the submission of this issue to the jury. We find no lack of notice.

▮ Defendant further complains that the lack of notice and the vagueness of the charges in the information entitled him to a bill of particulars. A technically proper information may be subject to a timely motion for a more definite statement if it is vague as to the specifics of the crime committed. *State v. Bonds*, 98 Wn.2d 1, 653 P.2d 1024 (1982); *see* CrR 2.1(e). A bill of particulars should be granted when it will aid defendant in preparing his case. *State v. Devine*, 84 Wn.2d 467, 527 P.2d 72 (1974). A ruling on a motion for particulars is discretionary with the trial court. *State v. Devine, supra*. Having found no lack of notice, we find no abuse of discretion in this case. Nothing in the record indicates what information, beyond that already provided, the State could have furnished to give additional notice of the charges.

C

Whether the Confrontation Right Was Violated
by Admission of Coconspirator Statements

Defendant's third contention is that the use of coconspirator statements violated his Sixth Amendment right to confront his accusers. The State argues that defendant failed to preserve this issue on appeal because the parties understood that the confrontation issue would be raised at trial, at the time the evidence was offered. Because a ruling was never requested on the confrontation issue, the coconspirator statements were admitted without objection at trial.

▮ When the issue is one of constitutional magnitude, this court will review an error not raised before the trial

court. *State v. McCullum,* 98 Wn.2d 484, 656 P.2d 1064 (1983); RAP 2.5(a). Admission of out–of–court declarations in a criminal trial, even when proper under the evidence rules, poses a potential constitutional issue that ordinarily justifies review.

■■ The constitutional right to confrontation does not invariably exclude inculpatory hearsay evidence at a defendant's trial. *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980); *State v. Parris,* 98 Wn.2d 140, 654 P.2d 77 (1982). The crucial determination is whether the unavailability of the declarant for cross examination deprived the trier of fact of a satisfactory basis for evaluating the truth of the out–of–court statements. *United States v. Fleishman, supra; State v. Parris, supra.*

Unless the declarant is legally unavailable, the defendant's right to confront accusers is paramount to the State's need for the hearsay testimony. Here, one of the coconspirator statements admitted at trial was made by Ramil, whose conviction for these killings is currently on appeal. One whose conviction is still pending has a continuing right to claim a Fifth Amendment privilege. *State v. McElyea,* 130 Ariz. 185, 635 P.2d 170 (1981); *State v. Sutterfield,* 45 Or. App. 145, 607 P.2d 789 (1980). A witness who invokes the privilege is "unavailable" for confrontation purposes. *State v. Solomon,* 5 Wn. App. 412, 487 P.2d 643 (1971). The other statement was made by coconspirator Boy Peli who could not be located during trial despite the State's repeated attempts to serve a subpoena.[2] Thus, we find that the prosecutor was unable to secure either declarants' testimony at trial. *See Ohio v. Roberts, supra* (prosecutor must demonstrate that a good faith effort was made to obtain the witness's presence at trial).

The second inquiry is whether there is sufficient "indicia of reliability" to allow the jury to assess the truthfulness of

---

[2]Defendant notes in his brief that Boy Peli was "found murdered" after the trial ended.

the statements and guarantee trustworthiness.[3] The objectionable statements were made to Robert San Pablo, the Alaska cannery foreman. On May 31, Ramil told San Pablo that the new union dispatch officer was to be killed the next day. After the killings, in the middle of June, Boy Peli told San Pablo about his and Dictado's involvement in the killings.

The trustworthiness of extrajudicial statements may be evaluated using such factors as the close proximity of the conversation to the crime, whether the statements were spontaneous and against declarant's penal interest, and whether there was apparent reason for declarant to lie. *State v. Boast,* 87 Wn.2d 447, 553 P.2d 1322 (1976); *see also State v. Parris, supra.* Federal cases have inquired whether there was incentive to provide truthful information, *United States v. Nelson,* 603 F.2d 42 (8th Cir. 1979); whether the statements were corroborated by admissions of defendant, *United States v. Weaver,* 565 F.2d 129 (8th Cir. 1977); whether other evidence at trial supported the statements, *United States v. Vadino,* 680 F.2d 1329 (11th Cir. 1982). These factors are not exclusive; all circumstances that indicate whether the statements are reliable should be considered. *State v. Parris, supra.*

The strongest argument for reliability is that the coconspirator statements were corroborated by defendant's own statements threatening the new dispatch officer and discussing "getting rid of" him with Tulisan members. Furthermore, Ramil's statement immediately followed a meeting between defendant, other Tulisan members, and San Pablo, in which defendant had again stated an intention to kill the victim. Ramil's statement strongly suggested

---

[3]Reliability may be inferred if the evidence fits within a firmly rooted hearsay exception. *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980). Under the evidence rules, coconspirator statements are no longer considered hearsay. *See* ER 801(d). Nevertheless, the parties assume that out-of-court coconspirator statements admitted for the truth of the matter do not automatically satisfy confrontation concerns. *See United States v. Perez,* 658 F.2d 654 (9th Cir. 1981).

his own complicity in the planned killing. The crime occurred the next day. Boy Peli's statement clearly implicated himself in the killings and served the purpose of convincing San Pablo that he must cooperate with defendant's demands regarding the gambling proceeds. Prior to Boy Peli's statement, San Pablo had already reported to a third party that defendant was the mastermind behind the killings. Taken as a whole, the evidence of the circumstances under which the statements were made, the motives of the various declarants, and the corroborating evidence provide a sufficient basis for the jury to assess the truth of the statements and support a finding of reliability.

## III
### ADMISSION OF NONCOCONSPIRATOR STATEMENTS AS PRIOR CONSISTENT STATEMENTS

Norman Van Vactor, San Pablo's immediate supervisor at the Alaska cannery, testified to two statements San Pablo made immediately upon learning of the death of the two victims and about 2 hours later. In the first, San Pablo told Van Vactor "they told me"; in the second, he named Dictado and Ramil as being involved in the killings.

ER 801(d)(1)(ii) provides that a statement is not hearsay if the declarant testifies at trial, is subject to cross examination concerning the statement, and the statement is consistent with his testimony and offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. Defendant's primary contention is that his cross examination of San Pablo did not charge him with recent fabrication or improper motive.[4]

On cross examination, San Pablo was questioned about inconsistencies between his present testimony and his testimony at the Ramil–Guloy trial; his previous attempt to

---

[4]Defendant also argues that the trial court erroneously relied on the excited utterance exception to admit these statements. The State argues exclusively that both statements were properly admissible as prior consistent statements, the second theory used by the trial court. We therefore assume that the State has abandoned the issue with regard to excited utterances and do not address it.

describe the argument between Dictado and the victim as a "little argument"; his not becoming a witness and not telling the police what he knew until the middle of July; his perception of a large indebtedness to union president Baruso; and *his meeting in Alaska with Baruso in the early part of July.* The trial court found that the cross examination raised an inference that San Pablo did not come forward as a witness until after Baruso visited him in Alaska in July.

█ The admission of prior consistent statements is a discretionary decision of the trial court subject to reversal only if manifest abuse is shown. *State v. Epton,* 10 Wn. App. 373, 518 P.2d 229 (1974). Although defendant's cross examination in this case was not extensive, the length or intensity of the examination is not the only determinative factor. *See, e.g., United States v. Provenzano,* 620 F.2d 985 (3d Cir. 1980). Of course, mere cross examination of the witness cannot alone justify admission of prior consistent statements. *See* 5A K. Tegland, Wash. Prac. § 342 (2d ed. 1982).

We find more than mere cross examination here. The inferences raised in cross examination were sufficient to allow counsel to argue that San Pablo had reason to fabricate *his story when he came forward in July.* The prior consistent statements, made in June, were properly admitted to rebut those inferences.

## IV
### USE OF DEFENDANT'S STATEMENTS MADE DURING POLICE INVESTIGATION AND AT THE FIRST TRIAL

The trial court refused to suppress statements defendant made to police detectives on June 16 without the benefit of *Miranda* warnings. Defendant claims that he was interrogated while in "custody" and, thus, *Miranda* warnings were required. *See, e.g., State v. Hawkins,* 27 Wn. App. 78, 615 P.2d 1327 (1980).

█ A case–by–case approach is generally used to determine what constitutes "custodial arrest" under *Miranda,*

when formal arrest has not been made. *See generally* 2 W. Ringel, *Searches & Seizures, Arrests and Confessions* § 27.3 (1983). Both subjective and objective tests have been developed, using the following combination of factors: (1) was there probable cause to arrest at the time of questioning? (2) did the officers intend to hold the suspect if he refused to cooperate? (3) did the defendant have a reasonable, subjective belief that he was in custody? (4) was the investigation focused on the defendant at the time of questioning? *See, e.g., United States v. Warren,* 578 F.2d 1058 (5th Cir. 1978), *cert. denied,* 446 U.S. 956 (1980); *LaPoint v. State,* 650 S.W.2d 821 (Tex. Crim. App. 1983).

This court has held that "mere suspicion before the facts are reasonably developed is not enough to turn routine investigatorial questioning of a witness into a custodial interrogation" for the purposes of requiring *Miranda* warnings. *State v. Green,* 91 Wn.2d 431, 436, 588 P.2d 1370 (1979), *rev'd on rehearing on other grounds,* 94 Wn.2d 216, 616 P.2d 628 (1980). Once the police have probable cause to arrest a suspect, however, delay in making the arrest cannot serve as an excuse for conducting interviews without *Miranda* warnings. *See, e.g., State v. Lewis,* 32 Wn. App. 13, 645 P.2d 722 (1982).

In this case, defendant was questioned by the police 2 weeks after the killings. He was met by the officers on the street and agreed to accompany them to their headquarters interrogation offices. The investigating officers testified that Dictado was one of as many as 20 suspects and that they did not have probable cause to arrest him. They were routinely questioning all suspects or potential witnesses who might help verify unsubstantiated leads. They also testified that the questioning was friendly and that they could not have restrained defendant had he refused to cooperate.

We do not find it dispositive that probable cause to arrest did not exist at the time of questioning. However, the circumstances of the questioning indicate that it was part of a routine general investigation with which defendant voluntarily cooperated. The trial court properly admit-

ted these statements.

Defendant also argues that suppression of his testimony as a material witness at the Ramil–Guloy trial was required because the trial court failed to give him *Miranda* warnings before he testified.

Defendant was brought to court to testify under a material witness warrant procured by the State. The detective executing the warrant gave Dictado verbal *Miranda* warnings, which Dictado acknowledged he understood. At the material witness hearing, outside of the presence of the jury, defendant was informed that he would be required to remain available as a witness that day, and, if not called, would be subject to subpoena. He was then called by the State, although the defense had endorsed him as a possible witness prior to trial. The trial judge did not give him *Miranda* warnings, nor inform him of his right to refuse to answer questions when incriminating responses were possible.

Defendant testified about the Tulisan, admitting his own membership and naming other members of the Tulisan, but denying that Ramil and Guloy were members. He acknowledged meeting socially with Baruso 2 days before the killings, but failed to recall an argument with one victim. He admitted that he had visited Ramil in jail, including the night prior to his testimony, and presented alibi testimony for both Ramil and Guloy. He was allowed to leave the courtroom at the conclusion of his testimony.

We cannot agree with defendant's assertion that *Miranda* requires suppression of this testimony in his own trial. *Miranda* warnings were developed to protect a defendant's right not to be compelled to make extrajudicial incriminating confessions or admissions at the behest of police interrogators while in the coercive environment of police custody. *See United States v. Mandujano*, 425 U.S. 564, 48 L. Ed. 2d 212, 96 S. Ct. 1768 (1976); *Labbe v. Berman*, 621 F.2d 26 (1st Cir. 1980); *Davidson v. State*, 54 Md. App. 323, 458 A.2d 875 (1983). None of the circumstances under which Dictado testified fit the *Miranda* scenario:

Defendant was not charged with or indicted for any crime at the time he was brought to court. He was informed by the trial court that he was required to remain in the courtroom for testimony purposes only, under a subpoena served at the hearing. He testified in open court in the presence of his counsel with whom he had previously discussed his testimony. Indeed, the *Miranda* warnings are inapt to this testimonial situation. A witness does not have an absolute right to remain silent when called to testify, as does a defendant in custody or on trial. *See United States v. Mandujano, supra; State v. Parker,* 79 Wn.2d 326, 331, 485 P.2d 60 (1971). We are thus reluctant to extend the requirement of *Miranda* warnings to a nondefendant witness's testimony in open court. *Accord, Labbe v. Berman, supra; United States v. White,* 589 F.2d 1283 (5th Cir. 1979); *United States v. Plesons,* 560 F.2d 890 (8th Cir.), *cert. denied,* 434 U.S. 966 (1977); *Davidson v. State, supra; State v. Williams,* 59 N.J. 493, 284 A.2d 172 (1971); *State v. Harge,* 94 N.M. 11, 606 P.2d 1105 (Ct. App. 1979).

Defendant suggests that without suppression under *Miranda,* his own prior testimony will have been unconstitutionally used to incriminate him. The constitution does not forbid self–incrimination. *United States v. Washington,* 431 U.S. 181, 52 L. Ed. 2d 238, 97 S. Ct. 1814 (1977). It does forbid, however, the use of involuntary statements against a defendant. *See, e.g., Mincey v. Arizona,* 437 U.S. 385, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978); *Mead Sch. Dist. 354 v. Mead Educ. Ass'n,* 85 Wn.2d 278, 534 P.2d 561 (1975). One giving testimony may protect against "compelled" disclosures by claiming a privilege against incriminating responses. *United States v. Mandujano, supra; Andino v. State,* 645 S.W.2d 615 (Tex. Ct. App. 1983); *State v. Parker, supra.* But one who voluntarily chooses to testify, forgoing the right not to provide answers when they might tend to incriminate, cannot later claim that the Fifth Amendment privilege was violated. *United States v. Washington, supra.*

The proper test to be applied in this setting is whether,

in light of all the circumstances, the free will of the witness was overborne. *United States v. Washington, supra.* We note that although defendant was brought to court to testify for the State, he had, on several occasions prior to trial, discussed his potential testimony with defense attorneys. He had indicated willingness to testify on behalf of Ramil and Guloy and was endorsed as a potential defense witness prior to trial. Defendant regarded Ramil's attorney as his own, and was represented by him prior to and during the testimony. Verbal *Miranda* warnings were given to defendant before he was brought to the courtroom, which warnings he indicated he understood. At one point during questioning, he asked the trial judge if he was required to answer a particular question, showing an understanding that he could refuse to answer.

The trial court found that defendant's testimony was voluntary. Defendant assigns no error to this finding. We also find no basis for a claim that his Fifth Amendment privilege was violated.

Defendant raises one further argument. Acknowledging that his counsel at the time he testified at the Ramil–Guloy trial was also defense counsel for Ramil, he points to a potential conflict of interest in the simultaneous representation. This conflict, he claims, deprived him of his right to effective assistance of counsel under the Sixth Amendment at a critical stage of the proceedings against him. *See, e.g., In re Richardson*, 100 Wn.2d 669, 675 P.2d 209 (1983).

We have recently reaffirmed that the Sixth Amendment right to counsel attaches only when formal judicial criminal proceedings have been initiated against a defendant. *State ex rel. Juckett v. Evergreen Dist. Court*, 100 Wn.2d 824, 675 P.2d 599 (1984). Defendant was present at the Ramil–Guloy trial only as a material witness. He was not arrested and charged in connection with the killings until 2 weeks after he testified. No Sixth Amendment right to counsel had attached at the time of the Ramil–Guloy trial which could have been infringed by the asserted conflict of interest.

## V
### CALLING UNION PRESIDENT BARUSO TO TESTIFY, KNOWING HE INTENDED TO INVOKE THE FIFTH AMENDMENT

Prior to calling Baruso to testify, the State informed the court of the questions that were to be asked, requesting a ruling on a question that Baruso had previously refused to answer. On direct examination, Baruso was asked 14 questions, all of which were answered without invoking a testimonial privilege. On cross examination, Baruso claimed privilege from answering all 17 of defense counsel's questions. Thereupon, the trial court held that the defense tactics had, in effect, waived any concern previously expressed regarding the witness's claiming the Fifth Amendment privilege in front of the jury, and allowed both sides, on redirect and recross, to ask questions that Baruso refused to answer.

Whether error has been committed by allowing testimony from a witness who claims a privilege not to answer depends on the facts and circumstances of the case. *State v. Nelson,* 72 Wn.2d 269, 432 P.2d 857 (1967). We evaluate the circumstances, using two factors emphasized by the United States Supreme Court in *Namet v. United States,* 373 U.S. 179, 10 L. Ed. 2d 278, 83 S. Ct. 1151 (1963). The first factor, prosecutorial misconduct in calling the witness to testify, does not apply here. The State legitimately called Baruso and limited its direct examination to nonprivileged information. We expressly sanctioned this procedure in *Nelson.* The second factor is whether the State used the inferences arising from the witness's refusal to answer to add "critical weight to the prosecution's case in a form not subject to cross–examination . . .", unfairly prejudicing defendant. *Nelson,* at 280, quoting *Namet,* at 186. The *Nelson* court distinguished situations in which the claims of testimonial privilege were merely cumulative support for inferences already well established by other evidence. *Nelson,* at 281. Here, inferences from Baruso's refusal to answer all questions on redirect added nothing new to the State's case.

Furthermore, even if the inferences were prejudicial to defendant, the cross examination tactics indicate that defendant waived any claim of prejudice arising from Baruso's refusal to answer privileged questions. The unfavorable inferences arose as much from privilege claimed on the State's redirect. The defense made a tactical gamble on the verdict and lost. The grounds to claim error are lost as well. *See State v. Williams,* 96 Wn.2d 215, 226, 634 P.2d 868 (1981).

## VI
### CONSTITUTIONALITY OF THE MANDATORY LIFE SENTENCE UNDER RCW 10.95

RCW 10.95.030(1) provides for a mandatory sentence of life imprisonment without the possibility of parole in non-capital aggravated murder cases. Defendant contends that this sentence violates due process, arguing that he must be afforded a sentencing hearing at which he could present evidence that might mitigate or substantiate the life sentence. From this, he appears to argue that the jury must have discretion to reduce the mandatory life sentence.

▮▮▮ Defendant concedes that the mandatory sentence of life imprisonment without parole for aggravated first degree murder does not constitute cruel and unusual punishment. *See State v. Grisby,* 97 Wn.2d 493, 497–98, 647 P.2d 6 (1982), *cert. denied,* 459 U.S. 1211, 75 L. Ed. 2d 446, 103 S. Ct. 1205 (1983). His concession, however, necessarily yields the argument. The assertion that he must be afforded a mitigating sentencing hearing is plausible only if the Legislature cannot require the mandatory sentence. If the mandatory sentence is valid, the lack of jury discretion is valid. Accordingly, a sentencing hearing before a jury could serve no purpose. Although defendant suggests that a mandatory sentence imposed without a mitigating hearing "rise[s] to the level of cruel and unusual punishment", he cites no authority to support that proposition.

The State suggests that defendant's real argument is that the parole board has been invalidly denied discretion to

grant parole. Parole is clearly a matter of "executive grace." *State v. Fain,* 94 Wn.2d 387, 394, 617 P.2d 720 (1980). Defendant has no right to have his sentence mitigated by possible parole.

Defendant also argues that the statute violates equal protection by giving the prosecutor unfettered discretion to charge either of two crimes (capital or noncapital aggravated murder), although either charge would necessarily be based on the same evidence. He further asserts this gives the prosecutor unconstitutional power to decide a defendant's sentence.

It has long been the rule in Washington that equal protection is violated when two statutes declare the same acts to be crimes, but penalize more severely under one statute than the other. *State v. Sherman,* 98 Wn.2d 53, 653 P.2d 612 (1982); *State v. Zornes,* 78 Wn.2d 9, 475 P.2d 109 (1970). There is no equal protection issue, however, when the requirements of proof and the State's ability to meet them are the considerations guiding the prosecutor's discretion. *State v. Canady,* 69 Wn.2d 886, 421 P.2d 347 (1966).

Under RCW 10.95.040(1) the prosecutor must file a notice of a special sentencing proceeding to determine whether the death penalty is to be imposed "when there is reason to believe that there are not sufficient mitigating circumstances to merit leniency." The prosecutor's discretion to seek or not seek the death penalty depends on an evaluation of the evidence of mitigating circumstances. This evaluation must determine if sufficient evidence exists to convince a jury beyond a reasonable doubt that there are not sufficient mitigating circumstances. *See* RCW 10.95-.060(4).

Although the exercise of prosecutorial discretion under the sentencing structure of RCW 10.95 is not strictly analogous to the exercise of discretion involved in the charging function, the principle is similar. The prosecutor does not determine the sentence; the prosecutor merely determines whether sufficient evidence exists to take the issue of miti-

gation to the jury. This type of discretion does not violate equal protection. *See State v. Sherman, supra.*

## VII
### REFUSAL TO ALLOW DISCOVERY OF POLICE "ROUGH NOTES"

Defendant was denied a request for discovery of police "rough notes" made during interviews with suspects and witnesses in the course of the investigation. A motion for discretionary review of the denial was refused by the Court of Appeals. The Court of Appeals directed, however, that the trial court review the rough notes in camera and compare these with the materials that had been provided to the defense. After reviewing these materials, the trial court found that all discoverable matters had been provided, noting that the only additional information contained in the rough notes concerned a confidential informant.

Defendant urges us to find that CrR 4.7(a)(1)(i) compels discovery of the rough notes. He does not appear to contest the trial court's determination that all discoverable information had been provided. Rather, his argument is that he should have been allowed access to the notes as of right.

We do not reach the question whether rough notes are discoverable as of right. Accepting the unchallenged finding that all discoverable material information had been delivered to the defense, we do not see how defendant was injured by the trial court's discretionary ruling. He makes no claim that he was surprised or prejudiced by undisclosed information introduced at trial. *See United States v. Surface,* 624 F.2d 23 (5th Cir. 1980).

Defendant also argues that he is constitutionally entitled to the information in the rough notes under *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). We disagree. The extensive pretrial proceedings on this issue and the evidence developed at trial do not indicate that exculpatory information was withheld that could have affected the outcome of the trial. *See United States v. Agurs,* 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976).

The trial court directed counsel to discuss the confidential informant with the prosecutor and, if not satisfied, further inform the court. No additional requests for information were made. Defendant has not shown that constitutionally material information remained undisclosed.

## VIII
### REFUSAL TO SEQUESTER THE JURY DURING THE PENDENCY OF THE TRIAL

Under CrR 6.7, the trial judge has broad discretion to determine whether the jury shall be allowed to separate during the trial, prior to deliberations. *State v. Wixon,* 30 Wn. App. 63, 631 P.2d 1033 (1981); *see also State v. Smalls,* 99 Wn.2d 755, 665 P.2d 384 (1983). For a defendant to claim abuse of that discretion, the record must indicate that either the nature of the publicity during the trial or the jury's exposure to that publicity created a probability of prejudice. *State v. Wixon, supra.*

Defendant does not make the required showing and, in fact, simply urges this court to "make an independent review of the record." What the record shows is that the trial court reviewed the extent of the pretrial publicity, and found that the vast majority of persons questioned for jury duty had only "some memory" of the publicity surrounding the killings, and that substantial time had elapsed from the time the publicity was disseminated. The trial court specifically stated, in denying the motion for sequestration, that the public interest surrounding the case was primarily related to a certain part of the community as opposed to the community in general; that sequestration might tend to unduly emphasize the case to the jury; and that nothing had yet been presented which indicated that proper admonishments to the jury would be inadequate to protect the defendant. The trial court further indicated that if counsel felt the situation had changed during trial, it would reassess its decision. The motion to sequester was not renewed. Under these circumstances, defendant has not shown an abuse of discretion.

In summary, we hold that coconspirator statements may be admissible at trial, whether or not conspiracy has been charged in the information. We find no error in the trial court's evidentiary rulings, and no constitutional infirmity in the mandatory life sentence imposed on defendant.

The conviction is affirmed.

WILLIAMS, C.J., ROSELLINI, UTTER, BRACHTENBACH, DOL-LIVER, DORE, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.