IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72367-7-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| WILLIE DARNELL BLAKENEY, | ) | |
| | ) | |
| Appellant. | ) | FILED: December 15, 2014 |

SCHINDLER, J. — A jury convicted Willie Darnell Blakeney of rape in the second

degree. Blakeney appeals, arguing the court erred in admitting the victim's prior

consistent statement under ER 801(d)(1)(ii). Because the error was harmless beyond a

reasonable doubt, we affirm.

FACTS

In October 2011, 49-year-old F.M. was homeless and living on the streets in

downtown Tacoma. In the early morning of October 19, F.M. was walking along 9th and

I Street looking for her daughter and son-in-law. Willie Darnell Blakeney passed F.M.

on the street and said, "What's up?" F.M. responded, "Not you." Blakeney got angry

and said, "Oh, you looking for your boyfriend?" F.M. told Blakeney to "leave [her]

alone." Blakeney hit F.M. in the back of the head, knocking her to the ground. F.M.

tried to call 911 on her cell phone but Blakeney started hitting her in the face with his

closed fists, causing her to drop the phone. F.M. said the punches were "coming so fast" she could not say how many times Blakeney hit her.

When Blakeney stopped hitting F.M., he said, "I'm going to show you what we do to people like you." Blakeney took his pants off and forced F.M. to put his penis in her mouth and perform oral sex. Blakeney then made F.M. pull down her pants and had vaginal intercourse with her. F.M. testified that she told Blakeney to stop but "he wouldn't." F.M. said Blakeney told her to "tell him it felt good" and threatened to hit her in the face again when she refused. Afterward, Blakeney told F.M., "[H]e never [did] anything like this" and "he wasn't this kind of person," and then he left.

F.M. started walking to St. Joseph Medical Center located a few blocks away. F.M. called 911 on her way to the hospital and said that she had just been assaulted and raped. Officer Joseph Mettler and Officer Jerry Wishard met F.M. at St. Joseph. F.M. testified that she told the police what had just happened and provided a description of Blakeney.

In December, F.M. recognized Blakeney as he was getting off a bus and called the police. Police officers detained Blakeney and confirmed his identity. Detective Jennifer Quilio created a photomontage and showed it to F.M. F.M. identified Blakeney as the man who raped her and a warrant was issued for his arrest. In November 2012, the police took Blakeney into custody. The State charged Blakeney with one count of rape in the second degree.

A number of witnesses testified during the three-day jury trial, including F.M., the sexual assault nurse who examined F.M., Officer Metler, Officer Wishard, Detective

Quilio, and a forensic scientist from the Washington State Patrol Crime Laboratory (WSPCL).

F.M. testified she was "scared [she] was going to die that night." F.M. said Blakeney broke her upper denture plate and made her nose bleed. F.M. testified that when she was at the hospital, the police asked her to write a statement about what occurred. F.M. said that she told the police the same thing that she testified to at trial. F.M. identified exhibit 21 as a copy of her statement. The State sought to admit exhibit 21 as a prior consistent statement. Defense counsel objected, arguing there was no implication "that [F.M.] gave inconsistent statements to the police regarding consent." The court sustained the objection.

Officer Wishard testified that he spoke with F.M. at the hospital and she "appeared very distraught, and . . . frightened." Officer Wishard said F.M. "had a swollen bloody lip and dried blood on her face" and the "collar of her shirt was stained with blood." The court admitted into evidence photographs taken at the hospital documenting F.M.'s injuries. Officer Wishard testified that F.M. agreed to write a statement.

Officer Mettler testified that he went to the sidewalk where F.M. said the rape occurred and observed blood droplets "in the street and along the curb" and what looked like semen in the street. Crime lab technician Lisa Rossi testified that she collected samples of the blood and semen found on the sidewalk.

Forensic Sexual Assault Nurse Examiner Kelly Morris testified that at approximately 8:00 a.m. on October 19, she examined F.M. at St. Joseph. Morris testified that F.M. told her "that she had been out and been attacked by a person, had

3

been hit in the face, and then sexually assaulted." Morris said F.M. "appeared to be very upset" and "was crying at times" and "many times, had to stop and compose herself when was she was actually telling me . . . what happened." Morris said F.M. had "blood all underneath her nose and caked on her lips and around her chin area. That whole area was dried and -- very, very dark, deep, dark red." Morris testified F.M. complained about pain and "said her face hurt." F.M. also said she was "hurting quite a bit . . . in the genital area." Morris observed a "small laceration to [F.M.'s] genital area" that was "consistent with what she told me" and "consistent with a sexual assault." Morris said that she took oral, vaginal, and anal swabs from F.M. and gave them to the police.

WSPCL forensic scientist Chris Sewell testified that the swabs collected from F.M. contained a mixed profile consistent with the DNA[1] of both F.M. and Blakeney. Sewell testified the semen collected from the sidewalk and from F.M.'s clothing contained a profile that matched Blakeney. Sewell testified that the probability of a random match was one in 1.1 sextillion.

Detective Quilio testified that when she interviewed Blakeney after his arrest in November 2012, Blakeney "indicated that he did not have anything to do with what I was talking about." Detective Quilio testified that when she told Blakeney a woman picked him out of a photo display as the man who assaulted her, he continued to deny he had assaulted someone and said he never had sex with anyone on the sidewalk near 9th and I Street. On cross-examination, Detective Quilio testified that 9th and I Street is a known prostitution area.

---

[1] Deoxyribonucleic acid.

4

The court admitted into evidence the 911 call F.M. made on October 19. On the recording, F.M. states that she has "just been raped" and is "scared this [inaudible] is following me." F.M. describes the assault, saying, "[A]ll of a sudden he came up behind me and hit me." F.M. says that she does not know the man who attacked her and describes him as African American, thin, "about 6 foot," in his fifties, with "an afro with a gray spot." F.M. is crying throughout the 911 call and says several times that she is "really scared." F.M. tells the 911 operator that she is afraid the man will return and is on her way to the emergency room at St. Joseph.

The defense did not dispute that Blakely and F.M. had sex. Blakeney testified that he often went to downtown Tacoma because he "could find prostitutes in that area." Blakeney testified he saw F.M. on Tacoma Avenue and 9th and thought she "was just a working girl." Blakeney said he approached F.M. and said, "[H]ello," and "she answered me really rude." Blakeney testified F.M. asked if he had any money and offered him "head," meaning oral sex. Blakeney testified that F.M. "attempt[ed] to give me some head, but I wasn't satisfied, so I got upset. I started--I assaulted her with my hand, open, twice. Twice, and I told her that she could do better than this." Blakeney testified that he "smacked" F.M. "a couple times" "hard enough to where her lip bust open." Blakeney said he "was really losing interest . . . and all of sudden [F.M.] said, 'Put it in.' " Blakeney testified F.M. told him she "hadn't had sex in six years . . . and that changed my mind again, and I'm like, huh. Six years. Okay. Put it in." Blakeney said he had vaginal intercourse with F.M. on the side of I Street for about 10 minutes.

Blakeney testified that there was a car parked on the opposite side of the street with two people sitting in it "smoking, getting high or something," and at some point, the

car drove closer and the driver asked if "everything was all right." Blakeney replied, "We all right," and then "looked at [F.M.] and she didn't say nothing, so they took off." Blakeney said after they had sex, he wiped some of the blood off F.M.'s face and said, " 'This is not me. I don't hit ladies.' And I--and I apologized to her, but I tried to explain, you know, because she disappointed me on oral sex, she disappointed me, and so, you know, she was bleeding." Blakeney denied threatening to kill F.M. and denied restraining her in any way. On cross-examination, Blakeney admitted he lied to Detective Quilio when he denied having oral or vaginal sex with anyone on the sidewalk of I Street.

After Blakeney testified, the State moved to admit the handwritten statement F.M. gave to Officer Wishard at St. Joseph as a prior consistent statement. Defense counsel objected on the ground that it was hearsay. The court ruled that the handwritten statement was admissible as a prior consistent statement "to rebut the implied and express charge that the witness fabricated the threats to be hit or even killed in her testimony."

Detective Quilio testified without objection that F.M. told her she was looking for her daughter in the early morning of October 19 when she encountered Blakeney. Detective Quilio testified F.M. said Blakeney started following her and then punched her in the face and orally and vaginally raped her. Detective Quilio testified F.M. "made it very clear that there were threats of violence," and F.M. said she "felt that . . . she had to comply or she was going to get hit again." In the handwritten statement F.M. made at St. Joseph, F.M. states Blakeney hit her, threatened her, and raped her orally and

6

vaginally. F.M. states she was "af[rai]d for my life" and scared Blakeney was going to kill her.

In closing, the defense argued F.M. was a prostitute and "she was walking up a hill to an area of high prostitution for a reason, such as prostitution." Defense counsel asserted the "lack of evidence that [F.M.] sought help" showed there was no forcible compulsion and F.M. "could have asked for help a couple different times. She never did until this was over, and then she wanted to get cleaned up and then she made these claims of sexual assault."

The jury found Blakeney guilty of rape in the second degree. The court imposed a standard range sentence.

## ANALYSIS

Blakeney seeks reversal, arguing the court erred in admitting the written statement F.M. made at the hospital as a prior consistent statement under ER 801(d)(1)(ii). Blakeney asserts the record establishes there was no implication of recent fabrication. We agree but conclude admission of the statement was harmless beyond a reasonable doubt.

Whether a prior statement is admissible under ER 801(d)(1)(ii) is within the trial court's discretion and will not be reversed absent a showing of manifest abuse of discretion. State v. Dictado, 102 Wn.2d 277, 290, 687 P.2d 172 (1984).

Prior consistent statements of a witness are not hearsay if offered to rebut the suggestion that the witness's testimony is a recent fabrication.[2] This rule allows admission of a witness's out-of-court statements to rehabilitate testimony that has been impugned by a suggestion of recent fabrication. State v. Bargas, 52 Wn. App. 700, 702, 763 P.2d 470 (1988). To constitute an express or implied charge, recent fabrication, or improper influence or motive, cross-examination or impeachment of the witness "must raise an inference sufficient to allow counsel to argue the witness had a reason to fabricate her story later." Bargas, 52 Wn. App. at 702-03. "The alleged fabrication must be recent because if the statement was made after the events giving rise to the inference of fabrication, it would have no probative value in counteracting the charge of fabrication." State v. Makela, 66 Wn. App. 164, 168, 831 P.2d 1109 (1992). A claim of recent fabrication "can be rebutted by the use of prior consistent statements only if those statements were made under circumstances indicating that the witness was unlikely to have foreseen the legal consequences of his or her statements." Makela, 66 Wn. App. at 168-69.

The State contends defense counsel's cross-examination of F.M. and Blakeney's testimony raised the inference that F.M. had reason to fabricate because she was actually engaged in prostitution and the sex with Blakeney was consensual.

During the cross-examination of F.M., defense counsel pointed out inconsistencies in her account. Defense counsel asked F.M. why she was walking

---

[2] ER 801(d)(1)(ii) provides in pertinent part:
A statement is not hearsay if—
    (1) Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is . . .
    (ii) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

around downtown Tacoma so early in the morning, and why she did not use her phone

to try to contact her son-in-law and daughter.

> Q. . . . [Y]ou were trying to get ahold of a relative at 5:00 in the morning; is that right?
>
> A. I was calling -- yeah, I was getting hold of a relative. I was looking for my son-in-law and my daughter because we went one way and the other way, you know. We separated.
>
> Q. Okay. You got separated at 5 a.m., right, and you -- instead of calling on your phone to meet them, you were walking up and down 9th Avenue?
>
> A. Because [the] phone he gave me didn't have no minutes on it. He told me just to use it for emergency.
>
> Q. And being homeless and being on South 9th Street at 5 a.m. on an October morning wasn't sufficient emergency to use a half a minute of phone time?

Defense counsel also asked F.M. why she did not scream for help.

> Q. Do you remember a car driving by and slowing down?
>
> A. Yes.
>
> Q. Did you tell the police about that?
>
> A. Yes.
>
> Q. You could have screamed for help at that time?
>
> A. He told me if I yelled, he'd hit me in the mouth again. He told me I better not say nothing. Even when I went towards the car, he told me to stop.
>
> Q. Okay. You could have gone to that car and screamed, "Help me, please"?
>
> . . . .
>
> Q. Okay. So the reason you didn't scream for help is that he told you not to; is that right?
>
> A. Right.
>
> Q. Do you remember any neighbor looking around?
>
> A. No. I didn't even know there was anybody else there.
>
> Q. Well, there's a church there, correct?
>
> A. Right.
>
> Q. And there are some apartment buildings there, correct?
>
> A. Right.
>
> Q. And you are testifying in court today, so we know that you can speak, and on that day, we know you had the strength and the wherewithal to say, "Not you," correct?
>
> Q. So you could have screamed, but you chose not to because he told you not to; is that right?
>
> A. Right.

9

While cross-examination of F.M. implies she was a prostitute and Blakeney testified F.M. was a prostitute, there is no inference that F.M. fabricated a story after making a written statement at the hospital. The defense theory was that F.M. fabricated her account of what happened from the beginning. Moreover, even if the questions did imply recent fabrication, F.M. made the statement to police after the rape occurred, at a time when she could foresee its legal consequences. We conclude the court erred in admitting the handwritten statement under ER 801(d)(1)(ii).

The State asserts even if admission of F.M.'s statement was error, it was harmless. We agree. Under the constitutional harmless error standard, we will not vacate the jury's finding if it appears beyond a reasonable doubt that the alleged error did not affect the verdict. State v. Monday, 171 Wn.2d 667, 680, 257 P.3d 551 (2011).

On direct examination, F.M. testified that she told the police the same thing she testified to on the stand—that Blakeney repeatedly hit her, threatened her, and raped her orally and vaginally. On the 911 call F.M. made immediately after the attack, she tells the 911 operator that she has "just been raped" and is "really scared." Officer Wishard testified that F.M. appeared distraught and frightened. Forensic nurse Morris testified that F.M. told her she had just been attacked, hit in the face, and sexually assaulted. Morris also testified that F.M. appeared to be very upset and that her injuries were consistent with the sexual assault she described. Detective Quilio testified that F.M. told her Blakeney punched her in the face and orally and vaginally raped her. The photographs admitted into evidence show that F.M. had injuries consistent with a violent assault. Blakeney admitted he struck F.M. hard enough to split her lip open.

10

In light of the overwhelming testimony, we conclude beyond a reasonable doubt that the error in admitting F.M.'s prior consistent statement did not affect the verdict of rape in the second degree.

We also conclude that unlike in State v. W.R., No. 88341-6, 2014 WL 5490399 (Wash. Oct. 30, 2014), the record establishes that the State, not Blakeney, bore the burden of proving whether sex was consensual.[3]

WE CONCUR:

---

[3] The court gave jury instruction 8 that complied with 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 41.02, at 760 (3d ed. 2008) (WPIC) defining the elements of rape in the second degree. Jury instruction 8 makes clear the State must prove beyond a reasonable doubt that "the sexual intercourse occurred by forcible compulsion." The court also gave the WPIC jury instruction defining "consent," jury instruction 6. See WPIC 45.04, at 835. In closing, the State emphasized that it bore the burden of proving all of the elements of the crime. "[T]he burden of proof is on me. It's beyond a reasonable doubt. It's always on me. What I have to prove is contained in Jury Instruction Number 8. . . . [T]o convict the defendant of rape in the second degree, I need to prove . . . that the sexual intercourse that occurred between [F.M.] and the defendant was done with forcible compulsion." The State argued F.M. "did not want to have sex with the defendant. She tells you that. She tells you this was not consensual. . . . [This] is not consensual sex. [This] is rape. She complies only because she doesn't want to get hit anymore."

11