[No. 28440-1-I. Division One. November 22, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. CONSTANTINE B. BARUSO, *Appellant.*

---

604

*Anthony Savage* and *Robert M. Leen,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Kathryn Goater* and *Rebecca J. Roe, Deputies,* for respondent.

GROSSE, J. — The appellant, Constantine Baruso, appeals his conviction for aggravated murder in the first degree. Baruso claims the trial court erred by not suppressing his post-*Miranda* statements made during police custody, which he claims are tainted by his pre-*Miranda* statements to the police made during the same interrogation. Baruso also contends the trial court erred by admitting the hearsay statements of a coconspirator, arguing that the statements were not made in the course of or to further the conspiracy. Lastly, Baruso challenges the trial court's imposition of a sentence for aggravated murder in the first degree claiming that because he was acquitted on a second count of premeditated first degree murder, that murder may not be taken into account as an aggravating circumstance.

Two members of the cannery workers union, Gene Viernes and Silme Domingo, were fatally shot at the union hall on June 1, 1981. Viernes died at the scene, and Domingo survived long enough to identify the perpetrators, Jim Ramil and Ben Guloy. Ramil and Guloy were members of a gang known as the Tulisan, which gang was involved in illegal gambling activities. Ramil and Guloy were tried and convicted for the murders.[1] The leader of the Tulisan, Tony Dictado, was also tried and convicted for his participation in the murders.[2] The State's theory of the murders was that the Tulisan intended to expand its gambling operation to Alaska. Dictado wanted to send gang members to Alaska through the union dispatch system; however, the dispatch had been recently reformed and under the new rules Tulisan members could not be dispatched. Viernes and Domingo had

---

[1] *See State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020 (1986).

[2] *See State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984).

participated in the reform movement, and Viernes was the union dispatch officer.

Baruso was the president of the cannery union. The Seattle police had contacted Baruso on a few occasions to discuss the murders. In June 1981, the murder weapon was found in a dumpster and turned over to police. The weapon was registered to Baruso, and Baruso had been observed with the weapon or one similar to it at union headquarters. On July 13, Detectives Boatman, Tando, and Cameron went to Baruso's place of employment to talk to him. They were informed, however, that Baruso had not shown up for work that day. Baruso was called at his residence and asked if the officers could come to his home to speak with him. Baruso agreed, and when the officers reached Baruso's home they informed him that they wanted him to accompany the officers to the police station. Baruso again consented and rode with the officers to police headquarters. The officers did not speak regarding the murders at that point, but engaged in casual conversation with Baruso until they had reached headquarters. Baruso was then shown into an interview room with a table and chairs. Baruso was seated at one side of the table and officers Boatman and Tando sat across from him. The murder weapon was placed on the table in front of Baruso. Baruso denied he had ever seen the weapon. Officer Boatman then produced the firearms transaction report with Baruso's name on it and gave it to Baruso, asking him if that was his name on the form. Baruso said it was. Baruso was then advised of his *Miranda* rights and he signed the pre-printed explanation of rights, but failed to sign the waiver portion of the document. After he was informed of his rights, police told him that the gun had been used in the murders of Domingo and Viernes. Baruso continued to speak with police, stating that he knew nothing about the murders. He told them he bought the gun but had never actually seen it because he never took it out of the sack. His statements were not in response to any questions by the officers. Baruso stated that he wanted an attorney. All questioning then ceased.

Baruso was charged with two counts of first degree aggravated murder on September 5, 1990. The State pursued two theories at trial: (1) the murders were part of a Tulisan gambling conspiracy, and (2) the murders were encouraged as part of a larger international conspiracy involving members of the Marcos family.

At a CrR 3.5 hearing to suppress Baruso's statements to the police, the trial court found the facts were undisputed and the officers had not taken coercive actions when speaking with Baruso. However, the court found the situation in the interrogation room was generally coercive. Nevertheless, the court concluded that the statements taken before and after the *Miranda* rights were given voluntarily, and therefore the post-*Miranda* statements were admissible. Detective Boatman testified at trial regarding Baruso's post-*Miranda* statements, which were refuted by other testimony.

At trial, Robert San Pablo, the Alaska cannery foreman, testified for the State. San Pablo related statements made by Boy Peli, a Tulisan member, after the killings in June 1981. Boy Peli had been dispatched to the Alaska cannery after the killings.[3] Over the objection of defense counsel, San Pablo testified that Boy Peli had conveyed threats from Dictado toward San Pablo in an effort to coerce a cut of gambling proceeds for Dictado. Boy Peli also told San Pablo that Ramil and Guloy were responsible for the murders of Viernes and Domingo and that Baruso had solicited Dictado to accomplish the murders for the sum of $5,000. San Pablo also stated that Boy Peli spoke about going to Baruso's house and examining the gun which had a silencer on it. He also discussed Boy Peli's statements that Baruso did not pay the $5,000, so he simply dropped off the gun.

At the close of the defense case, the court instructed the jury on the elements of first degree premeditated murder and aggravated first degree murder. The jury returned its verdict, finding Baruso guilty of the first degree premedi-

---

[3]Prior to trial of this case, Boy Peli was murdered.

tated murder of Viernes but not guilty of the first degree premeditated murder of Domingo. However, on its special verdict form, the jury found that both Viernes and Domingo died as the result of a common scheme or plan. Consequently, Baruso was convicted of aggravated murder in the first degree under RCW 10.95.020. He received a sentence of life without possibility of parole. Baruso appeals from the judgment and sentence.

■ Baruso argues that his post-*Miranda* statements made during his detention at police headquarters are inadmissible because they were tainted by his pre-*Miranda* statements to police and, therefore, the trial court erred by allowing the statements. We evaluate the trial court's determination in the suppression hearing independently because of the constitutional rights at stake. *State v. Mennegar*, 114 Wn.2d 304, 310, 787 P.2d 1347 (1990).

■ In order to preserve an individual's right against compelled self-incrimination under the Fifth Amendment, the police must inform a suspect of his rights before custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 1612, 10 A.L.R.3d 974 (1966). The lack of a proper *Miranda* warning prior to an initial confession does not necessarily prohibit the use of a subsequent post-*Miranda* confession. In *Westover v. United States*, a case consolidated with *Miranda v. Arizona, supra,* the United States Supreme Court stated that police are not necessarily precluded from interrogating and giving *Miranda* warnings to an individual who has been previously questioned without appropriate warnings. *Miranda*, 384 U.S. at 496. The Court indicated that if the individual is removed in time and place from the original surroundings, a second confession would be admissible. *Miranda*, 384 U.S. at 496. Under the "cat-out-of-the-bag doctrine", although a defendant is "never thereafter free of the psychological and practical disadvantages of having confessed", the Supreme Court has "never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from

making a usable one after those conditions have been removed." *United States v. Bayer*, 331 U.S. 532, 540-41, 91 L. Ed. 1654, 67 S. Ct. 1394 (1947).

Recently, the United States Supreme Court added an additional distinction to this doctrine with respect to the nature of the initial confession. In *Oregon v. Elstad*, 470 U.S. 298, 84 L. Ed. 2d 222, 105 S. Ct. 1285 (1985), the Court held that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary." (Footnote omitted.) *Elstad*, 470 U.S. at 318. The court held that if a suspect responds to unwarned, uncoercive questioning, he is not precluded from waiving his rights and confessing subsequent to appropriate *Miranda* warnings. *Elstad*, 470 U.S. at 318. If the second post-*Miranda* confession was voluntary, the statements are admissible. *Elstad* recognized the inherent difference between coercion of a confession by physical violence or deliberate means and a voluntary statement made in technical violation of the *Miranda* rule, finding that the *Westover* requirement of a break in the proceedings is not applicable in the latter situation. *Elstad*, 470 U.S. at 310. *See also State v. Allenby*, 68 Wn. App. 657, 661, 847 P.2d 1 (1992), *review denied*, 121 Wn.2d 1033 (1993).

In this case, the trial court's conclusions of law stated:

> The situation here, where the defendant was transported from his home to the police station in the company of three detectives, and taken to an interrogation room, is the kind of inherently coercive situation that is custody, regardless of whether the defendant is told he is under arrest.

However, the court further noted:

> All statements by the defendant were voluntary and, although the statements prior to the advice of rights are a *Miranda* violation, the statements are not rendered involuntary or unreliable.

Thus, although the court uses the term "coercive situation", it does not appear that it is referring to the kind of physical or mental coercion that undermines the suspect's will, as discussed in *Elstad*. Rather, it refers to the inherent nature

of custodial interrogation. Moreover, the court concludes that the initial statements were voluntary. The record supports this finding: The officers did not question Baruso prior to the *Miranda* warnings, his statements were volunteered.

Therefore, *Elstad* should apply, and the subsequent post-*Miranda* statements are admissible if voluntary. The inquiry of voluntariness is to be determined by taking into account the circumstances and course of conduct of police toward the suspect. "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Elstad*, 470 U.S. at 318. Here, the undisputed facts demonstrate that Baruso's statements were not made in response to any questions by the officers. Moreover, Baruso has not assigned error to the trial court's finding that the statements were voluntary.

Baruso relies primarily on *State v. Lavaris*, 99 Wn.2d 851, 664 P.2d 1234 (1983), a pre-*Elstad* case. *Lavaris* discusses at length the "cat-out-of-the-bag" doctrine which requires further intervening events to insulate the post-*Miranda* confession from the taint of the initial pre-*Miranda* confession. However, it is modified by *Elstad*, as discussed above. *See Allenby*, 68 Wn. App. at 661. Moreover, several courts have refused to apply the "cat-out-of-the-bag" doctrine to pre-*Miranda* statements that are exculpatory, as opposed to inculpatory. When a suspect has not confessed, he is no longer concerned that it is too late to do anything about an initial confession. The cat is not out of the bag. *See State v. Rupe*, 101 Wn.2d 664, 682 n.5, 683 P.2d 571 (1984); *United States v. Trabucco*, 424 F.2d 1311, 1319 (5th Cir.), *cert. denied*, 399 U.S. 918 (1970); *Sciberras v. United States*, 380 F.2d 732, 734 (10th Cir. 1967); *People v. Abreu*, 171 A.D.2d 630, 585 N.Y.S.2d 222, 223, *review denied*, 591 N.Y.S.2d 142 (1992); *People v. Garrison*, 176 Colo. 516, 491 P.2d 971, 973 (1971). *But see Miranda*, 384 U.S. at 477 (privilege against self-incrimination protects the suspect against any incrimination; distinction between inculpatory and exculpatory statements is impermissible).

Accordingly, because Baruso's initial pre-*Miranda* statements to police were voluntary, and the circumstances indicate that his post-*Miranda* statements were also voluntary, the post-*Miranda* statements were properly admitted by the trial court.

■ Baruso further contends the trial court erred by allowing Robert San Pablo to testify to the hearsay statements of Boy Peli. The hearsay statements of a coconspirator are admissible under ER 801(d)(2)(v):

> **(d) Statements Which Are Not Hearsay.** A statement is not hearsay if —
> (1) . . . .
> (2) *Admission by Party-Opponent.* The statement is offered against a party and is . . . (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Before admitting coconspirator statements under this rule, the trial court must make an independent determination that a conspiracy existed and that the defendant is a member of the conspiracy. *State v. Guloy*, 104 Wn.2d 412, 419-20, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). Baruso concedes as a legal matter that sufficient evidence supports a finding that Baruso was involved in a limited conspiracy with Dictado to murder Viernes and Domingo. Baruso argues, however, that the conspiracy ended when the murders were accomplished. The State argues the conspiracy was actually a broader gambling conspiracy, and the killings were evidence that the Tulisan would use deadly force and threats to accomplish its goals.

The testimony of witnesses in the record provides substantial evidence of a broader gambling conspiracy. San Pablo testified that organized gambling operations took place in the International District on King Street in Seattle. San Pablo testified that Dictado and the other members of the Tulisan were directly involved in the gambling operation and took a cut of the proceeds from each night's gambling. The money was given to the gang for protection. San Pablo stated that if the money was not given the gang members would disrupt the gamblers. San Pablo was working at the Alaska cannery in Dillingham as foreman in June 1981. He testified

that Dictado had approached him about dispatching Tulisan members to Dillingham to control the gambling there. His testimony also implicated Baruso's participation in the gambling operation.

Baruso argues that the State cannot use the gambling conspiracy as a basis for admitting the statements because (1) the information states that the killings were pursuant to an agreement, and (2) the conspiracy extended outside the charging period, May 1, 1981, to June 1, 1981. The information does state in part that the killings were pursuant to an agreement with agents of the Marcos government, but it also states that the murders were "part of a common scheme or plan". In light of the Supreme Court's discussion in *State v. Dictado*, 102 Wn.2d 277, 284-85, 687 P.2d 172 (1984), we find unpersuasive Baruso's contention that the State is precluded from presenting its gambling conspiracy theory because he had inadequate notice of it. The *Dictado* court notes that the inquiry is whether adequate notice was provided for the State's theory that there is a nexus between the killings and that the "scheme" may or may not amount to a conspiracy. *Dictado*, 102 Wn.2d at 285. The court noted in that case that the State's gambling theory was identical to the theory of the previous Ramil/Guloy trial and that Dictado had been provided with a complete transcript of that trial. The court also noted that the issue of "common scheme" had been briefed and argued in pretrial hearings; therefore, Dictado was on sufficient notice of the charges against him.

██ In this case, Baruso was on adequate notice that the State was going to rely in part on the gambling conspiracy. The record indicates that counsel for Baruso was provided with transcripts of the prior criminal trials of Ramil, Guloy, and Dictado, as well as the civil trial, which contained abundant evidence of the gambling conspiracy. The record indicates that the State's trial memorandum referred to both theories. The State's position was that the theories were not

mutually exclusive.[4] The fact that the gambling conspiracy is not specifically mentioned in the information is not dispositive of the issue as Baruso essentially received notice of the State's theory of a nexus between the killings. Nor should the fact that the conspiracy extended beyond the parameters of the time period set forth in the information preclude the State's evidence of the conspiracy. The murders took place within the charging period, and Baruso was not being charged with criminal conspiracy, but aggravated murder.

The trial court found sufficient evidence in the record that a prima facie case of conspiracy existed, and that finding is supported by the record.

Baruso also argues Boy Peli's statements were not made during the course of the conspiracy because the conspiracy to commit murder had ended. The evidence at trial, however, indicated that the scope of the gambling conspiracy was much broader and that the murders were committed to further the ends of the gambling organization which was to expand its activities to Alaska. The *Guloy* holding is consistent, the court concluding:

> The conspiracy did not end with the killing of Viernes and Domingo. Instead, it was in existence until at least the time Boy Peli went to Alaska and asked San Pablo to pay a $1,500 gambling commission.

*Guloy*, 104 Wn.2d at 423.[5]

Baruso also argues that the comments were not made in furtherance of the conspiracy, but were merely recitations of past events. Casual, retrospective statements about past

---

[4] In its opening argument, the State made apparent its alternative theories:

"And whichever road you choose to follow, be it the local motive for getting rid of Silme and Gene or interfering with the union business, as Mr. Baruso liked to run it, or the road of the international motive where Mr. Baruso, wishing to ingratiate himself with the powers that be, took care of the thorn in the side of the Marcos government by executing Gene and Silme, or the road of the facts of the murders, themselves, the defendant's gun, the State submits that all those roads lead directly to the defendant."

[5] Although Guloy assigned error to the trial court's admission of Boy Peli's hearsay statements to San Pablo, the Supreme Court did not rule on the issue because the objection at trial was inadequate to preserve the question for review.

events do not fall within the coconspirator exception. *State v. Anderson*, 41 Wn. App. 85, 105, 702 P.2d 481 (1985), *rev'd in part on other grounds*, 107 Wn.2d 745, 733 P.2d 517 (1987). However, the "in furtherance" requirement has been broadly construed and statements relating to past events have been found admissible if they facilitate the criminal activity of the conspiracy. *See, e.g., United States v. Tarantino*, 846 F.2d 1384, 1413 (D.C. Cir.) (statements intended to encourage cooperation with the conspiracy or enhancing a person's usefulness to the conspiracy are in furtherance of the conspiracy), *cert. denied*, 488 U.S. 867 (1988); *United States v. Ruggiero*, 726 F.2d 913, 924 (2d Cir.) (coconspirator's statements to undercover agent regarding three previous murders found to further conspiracy), *cert. denied*, 469 U.S. 831 (1984); *United States v. Herrero*, 893 F.2d 1512, 1528 (7th Cir.) (statements of conspiracy operations made in context of developing relationship between coconspirator and potential recruit found to further conspiracy), *cert. denied*, 496 U.S. 927 (1990). Here, San Pablo testified that the statements were veiled threats to encourage him to pay a cut of the gambling proceeds from the Alaska cannery to Baruso and Dictado. On June 15, San Pablo had received a note from Dictado requesting a $1,500 gambling commission payment, and on July 2, San Pablo received a letter from Baruso requesting a $1,500 cut of the gambling proceeds. Boy Peli described the murders to San Pablo and conveyed the threat that Dictado was going to blow up San Pablo's car unless he was paid the $1,500. The statements were directed toward establishing San Pablo's cooperation with the Tulisan and were made in furtherance of the conspiracy.

Lastly, Baruso claims that because the jury specifically acquitted him of the murder of Domingo, he cannot be held accountable for aggravated murder in the first degree of Viernes. Although the jury acquitted Baruso for the first degree premeditated murder of Domingo, it still found in its special verdict form B that Viernes and Domingo died as the result of a common scheme or plan, an aggravating factor for premeditated murder in the first degree. RCW 10.95.020(8).

As an initial matter, a judgment will not be reversed on the basis that the guilty verdict is inconsistent with acquittal on another count when the guilty verdict is supported by sufficient evidence. *State v. Ng*, 110 Wn.2d 32, 48, 750 P.2d 632 (1988). In *Ng*, the defendant was charged with felony murder and the lesser included offense of robbery. Although the defendant did not dispute the killings had occurred, the jury returned a verdict convicting him only on the robbery charges. Because the defendant should have therefore been guilty of felony murder, he argued the verdict was inconsistent, and his robbery conviction required reversal. The court noted that inherent problems in second-guessing the jury's rationale for acquittal warranted the application of *Dunn v. United States*, 284 U.S. 390, 76 L. Ed. 356, 52 S. Ct. 189, 80 A.L.R. 161 (1932). *State v. Ng*, 110 Wn.2d at 48. *Dunn* held that a defendant cannot attack a guilty conviction on the basis that it is inconsistent with a verdict of acquittal on another count. The court affirmed the conviction on the basis that overwhelming evidence supported the robbery convictions; therefore, the jury's inconsistent acquittal of the felony murder charges was not reversible error. *State v. Ng*, 110 Wn.2d at 48. Moreover, a special finding does not control a general verdict unless the two are so inconsistent that they cannot be reconciled. *State v. Peerson*, 62 Wn. App. 755, 765, 816 P.2d 43 (1991), *review denied*, 118 Wn.2d 1012 (1992).

In this case, however, the verdict is not truly inconsistent. The jury's special finding may be reconciled with Baruso's acquittal on the second count of first degree murder. Aggravated first degree murder requires that the jury find the defendant committed first degree premeditated murder and the existence of an aggravating circumstance. RCW 10.95-.020. The aggravating circumstance relied on by the jury is set forth in RCW 10.95.020(8):

> There was more than one victim and the murders were part of a common scheme or plan or the result of a single act of the person[.]

Under the plain language of the statute, the reference to "murders" is a reference to either murder in the first or

second degree. *State v. Kincaid*, 103 Wn.2d 304, 313, 692 P.2d 823 (1985). Therefore, in order to find aggravated murder for multiple victims, a jury must necessarily find that at least one murder was first degree, and the other was murder in the first or second degree. The critical issue presented in this case is whether a *conviction* for second degree murder is required to support the jury's finding of an aggravating circumstance of a common scheme or plan, an issue not yet addressed by Washington courts.

■■ A statutory aggravating circumstance is not an element of the crime, but an "aggravation of penalty" provision that allows an increased penalty when circumstances increase the gravity of the offense. *Kincaid*, 103 Wn.2d at 312. Accordingly, it is analogous to a finding of a deadly weapon enhancing the penalty for certain felonies. *Kincaid*, 103 Wn.2d at 312. An aggravating circumstance may enhance the penalty for first degree murder if the jury finds the existence of the statutory aggravating circumstance has been proved by the State beyond a reasonable doubt. *Kincaid*, 103 Wn.2d at 312.

In the present case, the jury's "to convict" instructions included the elements of premeditated murder in the first degree for each count. Instruction 6A stated that if the defendant was guilty of first degree murder in either count, the jury must further determine whether an aggravating circumstance existed, including "[t]hat both Gene Viernes and Silme Domingo died (1) as a result of a single act of the defendant or (2) as a result of a common scheme or plan." Instruction 7 further defined common scheme or plan:

> A "common scheme or plan" means that there was a connection or nexus between the *murders* and victims thereof. Only one of multiple *murders* committed as part of a common scheme or plan need be premeditated.

(Italics ours.)

Instruction 8 further defined murder:

> A person commits the crime of murder when with intent to cause the death of another person, he causes the death of such person or of a third person.

Instruction 8 essentially tracks the language of the second degree murder statute, RCW 9A.32.050:

> **Murder in the second degree.** (1) A person is guilty of murder in the second degree when:
> (a) With intent to cause the death of another person but without premeditation, he causes the death of such person or of a third person[.]

 The jury's verdict is consistent with a finding that Domingo's death was the result of second degree murder. The jury could not return a verdict for second degree murder because Baruso was not charged with that crime and it was not included as a lesser included offense in the "to convict" instructions. However, instruction 8 immediately following the "common scheme or plan" instruction contains a definition of "murder" that is consistent with the statutory requirements of second degree murder.[6] The jury was also instructed that it must find the aggravating circumstances were proved beyond a reasonable doubt. The jury's general and special verdicts are consistent with a finding that Domingo's death was second degree murder; therefore, a sufficient factual basis existed for a finding of a "common scheme or plan". Moreover, such a conclusion is supported by the evidence at trial. Although testimony indicated that Viernes' murder was premeditated by Baruso, the death of Domingo did not appear to be similarly premeditated. However, both deaths were linked by a common nexus: both men were murdered during the same incident by the same gunmen hired by Baruso. A finding of "common scheme or plan" does not require a preconceived plan to commit multiple murders or that both victims be killed for the same reason. *State v. Brown*, 64 Wn. App. 606, 619, 825 P.2d 350, *review denied*, 119 Wn.2d 1009 (1992).

Baruso argues that the "common scheme or plan" aggravating circumstance did not exist because, as the proven evidence indicated, only the murder of Viernes was intended, and Domingo's death occurred merely by happenstance be-

---

[6]The State argues that the jury's result is also consistent with a finding of second degree felony murder. However, no instruction was given to the jury on felony murder, so it is difficult to sustain the special verdict on that basis.

cause he was at the union hall when the gunmen arrived. Baruso's argument, however, disregards the nature of the second degree murder statute. The statute requires only that the offender intend the death of one person, and that intent is then transferred if instead the death of a third party occurs, regardless of whether the perpetrator intended the third party to die. Baruso's actions resulted in the death of both parties, and the jury had adequate evidence on which to find an aggravating circumstance of "common scheme or plan" beyond a reasonable doubt.

Accordingly, because the general verdict and special verdict are consistent with a jury finding of second degree murder of Domingo, and the jury had an instruction to support that finding, the verdicts are reconcilable. Aggravating circumstances are not themselves an element of the crime; there is no merit to Baruso's contention that he is being unjustly punished for two murders. The fact that the State chose not to charge the lesser included offense does not logically preclude its circumstances being taken into account as an aggravating circumstance.

We affirm the judgment and sentence of the trial court.

SCHOLFIELD and COLEMAN, JJ., concur.

Review denied at 124 Wn.2d 1008 (1994).