[No. 28610-6-II.   Division Two.   December 21, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. CARISSA MARIE
DANIELS, *Appellant*.

832

*Clayton R. Dickinson*, for appellant.

*Gerald A. Horne, Prosecuting Attorney*, and *Kathleen Proctor, Deputy*, for respondent.

¶1 HOUGHTON, J. — After Carissa Daniels's nine-week-old son died as a result of various injuries, the State charged her with one count of homicide by abuse and one count of second degree murder—domestic violence (felony murder) based on the alternate predicate offenses of second degree assault or first degree criminal mistreatment. The jury

convicted Daniels of second degree murder; it did not convict her of homicide by abuse.

¶2 Daniels appeals, arguing that her conviction must be reversed under *In re Personal Restraint of Andress*, 147 Wn.2d 602, 56 P.3d 981 (2002). The State cross-appeals, raising arguments based on evidentiary error and *Andress*.

¶3 In light of *Andress*, we reverse Daniels's conviction. In doing so, we hold that the State may retry Daniels only on second degree murder based on the predicate offense of criminal mistreatment.

## FACTS

¶4 Seventeen-year-old Daniels gave birth to her son, Damon, on July 9, 2000. On July 18, Daniels took the baby to the emergency department at St. Clare Hospital because he had blood in his mouth; a doctor did not find any problems with the baby.

¶5 On July 19, Daniels took Damon to a pediatrician who was not aware of the emergency visit. The doctor found that Damon had a cold and a right ear infection. On July 24, the same pediatrician examined the baby and found nothing wrong with him.

¶6 On August 10, the same doctor diagnosed a persistent ear infection and a cold. On August 22, at a follow up visit, the doctor found that the ear infection was resolving but that the baby still had some nasal congestion. Daniels scheduled follow up visits for September 7 and 8, but she cancelled these when her medical insurance changed.

¶7 On August 28, a new doctor examined Damon and found him fussy, feverish, and congested. The doctor diagnosed anemia and recommended a spinal tap test. The test results revealed no infection. On August 31, the doctor noted no change in Damon's condition.

¶8 On September 5, Daniels took Damon to the emergency department again for bleeding in his mouth. The doctor diagnosed a torn frenum.[1]

¶9 On September 11, Daniels left Damon with a babysitter who noticed a scratch on the baby's nose and that he vomited after each feeding. On September 12, Daniels left Damon at her school's child care. The caretaker noted Damon's fussiness but did not consider it abnormal because it was his first day at a day care.

¶10 Early on the morning of September 14, Daniels left Damon with her boyfriend. At approximately 3:00 P.M., her boyfriend called Daniels to say that Damon was not moving. Daniels asked her boyfriend to check Damon's temperature. The boyfriend called Daniels a second time to say that Damon's temperature was 98.7 and that he had a pulse and was breathing. When Daniels returned home, she found Damon "pale and limp." 13 Report of Proceedings (RP) at 1086. She called a nurse at Maternity Support Services, who instructed her to call 911 immediately.

¶11 When the paramedics arrived, they found Damon pulseless and not breathing. At approximately 10:00 P.M., a medical investigator examined Damon and noted both rigor mortis and fixed lividity, indicating a time of death approximately 10 to 12 hours earlier.

¶12 A later autopsy revealed that Damon had suffered many earlier injuries. The autopsy doctor testified that Damon sustained multiple 2- to 10-day-old rib fractures caused by compression of his chest with substantial force. The doctor also stated that approximately one week before his death, Damon sustained an injury to his frenum, which was caused by a blunt trauma to the upper lip, such as shoving a bottle into his mouth.

¶13 In addition, the autopsy showed that a day or two before his death, the baby suffered a blunt head trauma resulting in eye socket bruising and a swollen left eye.

---

[1] At trial, the doctor acknowledged that physical abuse may cause a torn frenulum; however, when he saw Damon he did not suspect abuse.

Finally, the autopsy revealed recent and older signs of cranial bleeding and shaken baby syndrome.[2] The autopsy results indicated that Damon died by homicide either by shaking or blunt head trauma.

¶14 On September 20, city of Lakewood detectives interviewed Daniels at the precinct station; Daniels's boyfriend and father accompanied her. The detectives declined to allow Daniels's father to be present during the interview.

¶15 The detectives interviewed Daniels for more than one and one-half hours before advising her of her *Miranda*[3] rights. Toward the end of the interview, when the detectives advised Daniels of her *Miranda* rights, she waived them. Shortly thereafter, Daniels became upset and asked for an attorney. The detectives ceased questioning her and she gave no further statements. The detectives told Daniels that she would be placed in a holding cell until she calmed down. Daniels remained in the holding cell while the detectives spoke with her boyfriend. The two then left.

¶16 The State charged Daniels by second amended information with homicide by abuse and with murder in the second degree—domestic violence, predicated on either second degree assault or first degree criminal mistreatment. The trial court suppressed some statements Daniels made to the law enforcement officers on September 20, because the detectives failed to properly advise her of her *Miranda* rights before questioning her.

¶17 After trial, the court provided the jury with two verdict forms, A and B. Verdict Form A, which the jury left blank, stated:

---

[2] At trial, a child abuse expert testified that approximately 10 seconds of shaking can cause shaken baby syndrome. According to the expert, 25 percent of shaken babies die. There may be no external signs of this injury or the signs may be indistinguishable from normal child behavior. A baby may be fussy, irritable, or very quiet. Also, a baby may have no appetite or may vomit after eating.

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (before a custodial interrogation takes place, the police must warn the person of the right to remain silent, that any statement may be used as evidence against the person, and that the person has a right to have an attorney).

We, the jury, find the defendant _____ (Not Guilty or Guilty) of the crime of homicide by abuse as charged in Count I.

_____

PRESIDING JUROR

Clerk's Papers (CP) at 107. Verdict Form B, which the presiding juror filled in and signed, stated:

> We, the jury, having found the defendant, Carissa M. Daniels, not guilty of the crime of homicide by abuse as charged in Count I, or being unable to unanimously agree as to that charge, find the defendant <u>Guilty</u> (Not Guilty or Guilty) of the alternatively charged crime of murder in the second degree.
>
> [signed by the Presiding Juror]
>
> PRESIDING JUROR

CP at 108. The court's instructions did not ask the jury to indicate which offense formed the predicate of the second degree murder conviction.

¶18 The court polled the jurors individually, inquiring whether it was each individual juror's decision and the jury's decision. All of the jurors answered yes to each question. The trial court dismissed the jury without further inquiry. Daniels appeals her conviction, and the State cross-appeals.

ANALYSIS

Daniels's Appeal

Second Degree Felony Murder

¶19 Daniels contends that *Andress* precludes using assault as a predicate offense to second degree felony murder. 147 Wn.2d 602. She asserts that because the jury did not specify whether it relied on assault or criminal mistreatment in finding her guilty, her conviction must be

reversed.[4] We agree that *Andress* requires reversal. 147 Wn.2d at 616 (assault cannot serve as the predicate offense for second degree felony murder). But our inquiry does not end here. Daniels also contends that (1) double jeopardy bars her retrial on either felony murder or homicide by abuse;[5] or (2) insufficient evidence supports that she criminally mistreated Damon; or (3) criminal mistreatment, like assault, is legally insufficient to form a predicate offense to felony murder. We address each argument in turn.

## Double Jeopardy

¶20 Daniels argues that retrying her on second degree felony murder based on the alternate predicate offense of criminal mistreatment violates her constitutional rights under the double jeopardy clause. The double jeopardy clause guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *State v. Corrado*, 81 Wn. App. 640, 645, 915 P.2d 1121 (1996), *review denied*, 138 Wn.2d 1011 (1999). "Generally, it bars retrial if three elements are met: (a) jeopardy previously attached, (b) jeopardy previously terminated, and (c) the defendant is again in jeopardy 'for the same offense.'" *Corrado*, 81 Wn. App. at 645 (citations omitted).

¶21 As a general rule, jeopardy attaches in a jury trial when the jury is sworn. *Corrado*, 81 Wn. App. at 646. Jeopardy terminates with a verdict of acquittal or with a conviction that becomes unconditionally final. *Corrado*, 81 Wn. App. at 646, 647. Also, jeopardy terminates when the State fails to produce evidence sufficient to prove its

---

[4] In its supplemental brief, the State concedes that no one can discern whether the jury convicted Daniels based on second degree assault or first degree criminal mistreatment.

[5] After argument, we called for additional briefing narrowing the focus of this appeal. As a result, we address the question of the remedy where *Andress* renders one predicate offense legally insufficient and no special verdict form indicates which predicate offense formed the basis of the jury's second degree murder conviction.

charge.[6] *Burks v. United States*, 437 U.S. 1, 10-11, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).

¶22 The United States Supreme Court has " 'expressly rejected the view that the double jeopardy provision prevent[s] a second trial when a conviction ha[s] been set aside;' instead, it has 'effectively formulated a concept of continuing jeopardy that has application where criminal proceedings against an accused have not run their full course.' " *Corrado*, 81 Wn. App. at 647 (citations omitted). Thus, the double jeopardy clause imposes no limits on the power to retry a defendant who has succeeded in setting aside his or her conviction, and a defendant's successful appeal of a judgment of conviction, on any ground other than the insufficiency of the evidence, poses no bar to further prosecution on the same charge. *Corrado*, 81 Wn. App. at 647-48.

¶23 Applying these principles here, Daniels successfully brought this appeal. Therefore, her conviction has been set aside and her jeopardy did not terminate. Because Daniels's jeopardy is continuing, the double jeopardy rule does not apply. *Corrado*, 81 Wn. App. at 648. Thus, because assault no longer serves as a predicate offense to felony murder and because double jeopardy does not apply, we hold that Daniels may be retried on second degree felony murder, provided no other legal principle precludes retrial.

### Insufficient Evidence

¶24 Daniels contends that insufficient evidence supports finding her guilty of criminal mistreatment. Therefore, she asserts, her felony murder conviction must be reversed and dismissed.

¶25 When a defendant challenges sufficiency of the evidence, we draw all reasonable inferences in favor of the State. *State v. Ward*, 148 Wn.2d 803, 815, 64 P.3d 640 (2003). If, after viewing the evidence in the light most

---

[6] We address separately the sufficiency of evidence as to the criminal mistreatment charge.

favorable to the State, we determine that any rational fact finder could have determined guilt beyond a reasonable doubt, we affirm. *State v. Johnson*, 90 Wn. App. 54, 73, 950 P.2d 981 (1998). We need not be convinced of a defendant's guilt beyond a reasonable doubt, only that substantial evidence supports the State's case. *State v. Gallagher*, 112 Wn. App. 601, 613, 51 P.3d 100 (2002), *review denied*, 148 Wn.2d 1023 (2003). We accord circumstantial evidence the same weight as direct evidence. *Johnson*, 90 Wn. App. at 73.

¶26 RCW 9A.42.020(1) defines criminal mistreatment:

> A parent of a child, the person entrusted with the physical custody of a child or dependent person, or a person employed to provide to the child or dependent person the basic necessities of life is guilty of criminal mistreatment in the first degree if he or she recklessly[7] . . . causes great bodily harm[8] to a child or dependent person by withholding any of the basic necessities of life.[9]

Here, the State had to prove beyond a reasonable doubt that Daniels was entrusted with the physical custody of Damon and that she recklessly caused or allowed someone else to cause great bodily injury to Damon, resulting in his death.

¶27 The record shows that during the days before he died, Damon sustained many severe blunt trauma injuries, including: multiple two- to ten-day-old rib fractures caused by substantial force compression of his chest, cranial bleeding and shaken baby syndrome, eye socket bruising and

---

[7] "A person is reckless or acts recklessly when he knows of and disregards a substantial risk that a wrongful act may occur and his disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise in the same situation." RCW 9A.08.010(1)(c).

[8] Great bodily harm is "bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily part or organ." RCW 9A.42.010(2)(c).

[9] Food, water, shelter, clothing, and medically necessary health care, including but not limited to health-related treatment or activities, hygiene, oxygen, and medication comprise basic life necessities. RCW 9A.42.010(1).

swelling, and a torn frenum. Other than brief instances, Daniels and her boyfriend were Damon's caretakers throughout his short life. This evidence sufficiently establishes that Daniels caused or encouraged, aided, or assisted someone else to cause the baby's injuries.

### Criminal Mistreatment as a Predicate Offense

¶28 Daniels further argues that, because any criminal mistreatment here resulted in death, the conduct constituting criminal mistreatment is the same as the conduct causing the homicide. And because the criminal mistreatment is not independent of the homicide, here, as in *Andress*, it cannot serve as a predicate offense to second degree felony murder.

¶29 According to former RCW 9A.32.050(1)(b) (2002), a person is guilty of second degree murder when:

> He commits or attempts to commit any felony . . . and, in the course of and in furtherance of such crime or in immediate flight therefrom, he, or another participant, causes the death of a person other than one of the participants;

In *Andress*, our Supreme Court held:

> It is nonsensical to speak of a criminal act—an assault—that results in death as being part of the res gestae of that same criminal act since the conduct constituting the assault and the homicide are the same. Consequently, in the case of assault there will never be a res gestae issue because the assault will always be directly linked to the homicide.

147 Wn.2d at 610. Similarly, Daniels argues, because it is impossible to commit homicide without criminally mistreating a victim, criminal mistreatment as a predicate offense of felony murder becomes a legal impossibility. We disagree.

¶30 Although one cannot commit homicide without assaulting a victim, one can commit homicide without criminally mistreating the victim. One commits first degree criminal mistreatment of a victim when he or she recklessly

causes great bodily harm by withholding basic necessities of life. RCW 9A.42.010(1), (2)(c), .020(1). But to commit a homicide, it may not be necessary to withhold the basic necessities of life. Therefore, we hold that criminal mistreatment is independent of homicide and thus can serve as a predicate offense to second degree felony murder.

## Homicide by Abuse

¶31 Finally, Daniels argues that by leaving the verdict form blank, the jury implicitly acquitted her on the homicide by abuse charge, thereby terminating her jeopardy, and that double jeopardy bars her retrial on that charge.

¶32 We must first determine whether Daniels's jeopardy terminated. Because jeopardy terminates with a verdict of acquittal, *Corrado*, 81 Wn. App. at 646, we must first determine whether the jury acquitted her on the homicide by abuse charge. Two cases add insight into the question of under what circumstances jury silence as to a particular charge constitutes an acquittal: *State v. Davis*, 190 Wash. 164, 67 P.2d 894 (1937)[10] and *State v. Hescock*, 98 Wn. App. 600, 602, 989 P.2d 1251 (1999).

¶33 In *Davis*, the jury returned a not guilty verdict on count I (vehicular homicide) and did not return verdicts as to counts II (driving while intoxicated) and III (reckless driving). 190 Wash. at 164-65. The record showed that the jury foreman told the court that a " 'verdict had been reached on count one, but that the jurors could not agree upon verdict on counts two and three.' " *Davis*, 190 Wash. at 165 (citing the trial court's clerk's papers). The court discharged the jury without explanation. *Davis*, 190 Wash. at 165. Davis moved to dismiss counts II and III, arguing that double jeopardy barred retrial. *Davis*, 190 Wash. at 165. The court granted the motion and the State appealed. *Davis*, 190 Wash. at 165.

---

[10] *Bickelhaupt v. Inland Motor Freight*, 191 Wash. 467, 471, 71 P.2d 403 (1937) also follows *Davis* (jury silence as to a defendant's charge is equal to a verdict amounting to acquittal).

¶34 In deciding *Davis*, our Supreme Court noted that,

[as] a general rule supported by the great weight of authority, . . . where an indictment or information contains two or more counts and the jury either convicts or acquits upon one and is silent as to the other, and the record does not show the reason for the discharge of the jury, the accused cannot again be put upon trial as to those counts.

190 Wash. at 166. The court further noted that "[t]he fact that the foreman of the jury informed the court that they could not reach a verdict on those counts does not make a record of the reason why the court so acted." *Davis*, 190 Wash. at 166.

¶35 In sum, the *Davis* court held that because the jury was silent as to counts I and II, and the record did not show why the court discharged the jury, double jeopardy barred the State from retrial on counts II and III; the effect being that the jury's silence amounted to an acquittal. But the *Davis* court also noted that, had something in the record explained why the court discharged the jury, the explanation might allow the State to retry Davis on both counts. 190 Wash. at 167.

¶36 In *Hescock*, 98 Wn. App. at 602, the State charged Hescock in juvenile court with one count of forgery by two alternate means, RCW 9A.60.020(1)(a), (b). The trial court found Hescock guilty of violating only RCW 9A-.60.020(1)(a), but it was silent as to the (1)(b) alternative. *Hescock*, 98 Wn. App. at 602.

¶37 On appeal, Hescock argued, and the State conceded, that insufficient evidence supported his conviction under alternative (1)(a). Hescock then argued that double jeopardy prevented his retrial under alternative (1)(b). *Hescock*, 98 Wn. App. at 602. As to the (1)(b) alternative, the *Hescock* court noted that, because the trial judge had ample opportunity to convict Hescock but he did not, the trial judge's silence as to the (1)(b) alternative constituted an implicit acquittal, barring Hescock's retrial on that charge.

¶38 Here, Daniels was put in jeopardy when the jury was sworn. *Corrado*, 81 Wn. App. at 646. Next, we

must determine whether the jury's silence as to an adjudication of the homicide by abuse charge amounts to an acquittal, thereby terminating Daniels's jeopardy as to that charge.

¶39 The jury had ample opportunity to convict Daniels but it left the corresponding verdict form blank. Moreover, the record insufficiently shows why the court dismissed the jurors without reaching a decision on homicide by abuse. Under these facts, the jury's silence constitutes an implicit acquittal.

¶40 Finally, our determination that the jury implicitly acquitted Daniels of homicide by abuse is bolstered by the language of the Verdict Form B, which recites, "having found the defendant, Carissa M. Daniels, not guilty of the crime of homicide by abuse as charged in Count 1, or being unable to unanimously agree as to that charge . . . ."[11] CP at 108. As such, Daniel's jeopardy terminated when the jury implicitly acquitted her. Therefore, double jeopardy bars the State from retrying her on the homicide by abuse charge.[12]

## The State's Cross-Appeal

### *Andress*

¶41 In its cross-appeal, the State argues that we should abandon *Andress* as erroneous and harmful or that we should apply it prospectively only. Our Supreme Court and we have addressed and rejected these arguments in *State v. Hanson*, 151 Wn.2d 783, 784, 91 P.3d 888 (2004); *In re Personal Restraint of Hinton*, 152 Wn.2d 853, 100 P.3d 801 (2004); *State v. Hughes*, 118 Wn.

---

[11] Under these circumstances, the principles of lenity require us to interpret any ambiguity in favor of the criminal defendant. *State v. Taylor*, 90 Wn. App. 312, 317, 950 P.2d 526 (1998).

[12] Because we hold that the jury implicitly acquitted Daniels, and because an acquittal terminated her jeopardy, it is unnecessary for us to consider whether the State produced sufficient evidence to prove the homicide by abuse charge, as insufficient evidence would also have terminated Daniels's jeopardy. *Burks*, 437 U.S. at 10-11.

App. 713, 721 n.12, 77 P.3d 681 (2003); *State v. Gamble*, 118 Wn. App. 332, 335, 72 P.3d 1139 (2003).

## *Miranda* Warnings

¶42 The State also argues that the trial court erred in excluding Daniels's statements to the police made on September 20, 2000, before she received her *Miranda* warnings. The State asserts that Daniels knew she was not in custody and that *Miranda* did not apply.

¶43 The Fifth Amendment right against compelled self-incrimination requires police to inform a suspect of his or her *Miranda* rights before a custodial interrogation. *State v. Baruso*, 72 Wn. App. 603, 609, 865 P.2d 512 (1993), *review denied*, 124 Wn.2d 1008 (1994). The *Miranda* exception applies when the interview or examination is (1) custodial, (2) through interrogation, and (3) by a state agent. *Thompson v. Keohane*, 516 U.S. 99, 102, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995), *cert. denied*, 525 U.S. 1158 (1999).

¶44 A suspect is deemed in custody for *Miranda* purposes as soon as his or her freedom is curtailed to a degree associated with formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). Two discrete inquiries are essential to the determination of whether a suspect was in custody at the time of an interrogation: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate interrogation and leave. *Thompson*, 516 U.S. at 112. An interrogation occurs when the investigating officer should have known his or her questioning would provoke an incriminating response. *State v. Sargent*, 111 Wn.2d 641, 650-52, 762 P.2d 1127 (1988).

¶45 Here, 17-year-old Daniels spent more than one and one-half hours in the precinct station where detectives asked her questions knowing that their questioning could provoke an incriminating response. And the detectives

declined to allow Daniels's father to remain with her. These circumstances sufficiently demonstrate that *Miranda* applied. The trial court properly suppressed Daniels's statements.

¶46 Reversed and remanded for further proceedings consistent with this opinion.

BRIDGEWATER and ARMSTRONG, JJ., concur.

Reconsideration denied March 10, 2005.