IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 29075-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID EUGENE RICHARDS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, A.C.J. — David Richards appeals his conviction of second degree felony murder and first degree manslaughter. He makes six assignments of error and argues, alternatively, that cumulative error denied him a fair trial. He alleges additional errors in a pro se statement of additional grounds.

We find no reversible or cumulative error and affirm.

FACTS AND PROCEDURAL BACKGROUND

Michelle Kitterman was found murdered on March 1, 2009, on the side of a road, about 14 miles from her home in Tonasket. At the time she was killed, she was 11 weeks pregnant with the child of Daniel Pavek. Investigation would lead the Okanogan County prosecuting attorney to charge four individuals with what the State concluded was a murder for hire: it charged Lacey Hirst, Pavek's wife, who knew her husband was

having an affair with Kitterman and wanted her killed; Tansy Mathis, a drug dealer, whom Hirst knew and enlisted to arrange for the murder; David Richards, also a drug dealer and a customer of Mathis, whom Mathis enlisted; and Brent Phillips, whom Richards enlisted. Phillips eventually pleaded guilty to first degree premeditated murder and other crimes and testified against Richards and Mathis at trial.

Phillips testified that at the time of the murder, he was living with Richards in Spokane. Richards was providing him with housing and methamphetamine in exchange for Phillips serving as Richards's "tax man." Report of Proceedings (RP) at 793. He testified that as Richards's "tax man," he would "[use] force or scare tactics to get the money that's owed to him." *Id.*

Phillips was introduced to the crime being planned against Kitterman on the day before she was murdered, when Richards told Phillips that he needed someone to travel with him and Mathis "to go pick up dope, and that there was a snitch that might need to be taxed," meaning a police informant who needed to be intimidated. RP at 797. When the time came to leave for Okanogan County, though, Richards was asleep (or, as Phillips later testified, was "faking a sleep," RP at 804), so only Phillips accompanied Mathis, who was driving a rental car Hirst had made available for the crime. A friend of Richards's would testify that Richards told her he learned that the plan, in which he was supposed to participate, was to intimidate a woman pregnant with a married man's child

2

with the objective of aborting the baby, and for that reason he decided to stay in Spokane instead.

Before Mathis and Phillips left Spokane, Mathis told Phillips that they would receive $1,000 to beat up the snitch and an additional $500 if anyone else got in the way. With that understanding, they drove to Kitterman's home. Before entering, Mathis told Phillips that there could be more money involved—$10,000 plus $5,000 for anybody additional in the way—if things did not go right and someone had to be killed. After the two were invited in by Kitterman, Phillips offered her methamphetamine, the three smoked it together, and Mathis then suggested that they all go to a nearby casino. Kitterman eventually agreed and they all left in the rental car.

As the three neared the casino, Mathis pulled over because Kitterman wanted to smoke more methamphetamine and Mathis said she could not do it in the car. Once Kitterman was out of the car, Mathis told Phillips that Kitterman was the snitch. Phillips took this as his cue to assault Kitterman. Mathis soon joined him in the assault. She had retrieved an ice pick-like weapon from the car; it was variously described by witnesses as an ice pick, a leather punch, or a three-sided file, and it belonged to Richards. Phillips later testified that it was Richards's favorite weapon. As Phillips choked Kitterman, who was on the ground, Mathis began stabbing her in the stomach. When Mathis told Phillips to "finish it," he stabbed Kitterman several times in the back. RP at 826. Phillips threw

3

Kitterman to the side of the road and he and Mathis left. After abandoning Kitterman,

Mathis and Phillips cleaned the rental car.

Before returning to Spokane, Mathis handed Phillips an envelope containing $500

to give to Richards. Phillips told her Richards would prefer methamphetamine, so Mathis

took the money back and gave Phillips drugs to give to Richards.

Upon Phillips's return to Spokane, Richards asked about payment from Mathis

and indicated awareness that something "had happened." Phillips testified:

> A     He kept asking me what happened. And I wouldn't tell him what
> happened. And then I ended—he asked me again, he's, "Oh, come
> on, what happened." And I told him, I said, "Well, the shit
> happened, man; know what I mean?"
>      And he said, "Well, when you get ready to tell me, you know,
> I'm here to listen." That's what he said.
>
> Q     At some point did he ask you for payment?
>
> A     He asked me if I had anything for him, from Tansy. And I said,—I
> said "Yeah," and I handed him the dope. And he looked at it and he
> said, "This is all?" And I said, "Yeah."

RP at 842. Phillips testified that Richards was upset upon seeing the amount of

methamphetamine provided and, after that, was "trying to get a hold of Ms. Mathis."

RP at 843.

Detectives investigating the murder identified Mathis and Phillips as suspects and

received information that following the murder they returned to Spokane, to a particular

residential address. It turned out to be Richards's residence. Spokane detectives

assisting with the Okanogan investigation went to the address, where Richards answered

4

the door and identified himself when asked. When detectives did an NCIC/WASIC[1] check on his name, they learned that there was an outstanding warrant for his arrest for failure to pay fines; they relied on the warrant to handcuff him and transport him to the Spokane police department, where they asked him what he knew about the Kitterman murder. The detectives told him that if he was forthcoming they would release him and let him take care of the fines and warrant on his own. Because they considered him only a witness at that point, not a suspect, the detectives did not read Richards his *Miranda*[2] rights.

Richards was initially reticent, telling the detectives after being detained for a couple of hours that he "didn't want to be a snitch." RP at 278. The detectives then ended the interview and escorted Richards to the jail to book him on the outstanding warrant. As they approached the jail, Richards stated, "'Okay, I'll talk. Hollywood told me he did it.'" RP at 279. "Hollywood" was a name used by Phillips. The detectives took Richards back to the interview room and read him his *Miranda* rights. At points during the advisement process, Richards told officers he did not want to "give up his rights," and "thought he was being blackmailed into talking," but he nonetheless signed a rights card, was read his rights a second time, and gave a statement denying involvement

---

[1] National Crime Information Center and Washington State Information Center.

[2] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

5

in the murder. RP at 281. He told detectives that Phillips had admitted having stabbed Kitterman several times. The detectives released Richards as promised.

Phillips was later arrested and interviewed, and claimed that Richards stabbed Kitterman. Based on Phillips's statement, the State eventually charged Richards, as a principal or accomplice, with aggravated murder or alternatively felony murder, first degree manslaughter (unborn quick child), and first degree kidnapping. He was charged with deadly weapon enhancements on all counts. By the time of trial, Phillips had recanted his accusation that Richards stabbed Kitterman. He testified that Richards had not gone to Tonasket with him and Mathis.

Mathis and Richards were tried together and each testified. Mathis blamed the murder on Phillips. She agreed that Richards did not travel to Tonasket and was not present when Kitterman was murdered. Richards testified that on the day before Kitterman's murder, Mathis had merely asked him to take a road trip with her to pick up and deliver drugs. He claimed he never went because he fell asleep. He testified that he learned Mathis left for the road trip without him but did not know that Phillips had gone with her until Phillips returned to Spokane. He also testified that his ice pick had gone missing the day before Kitterman's murder and he had no idea that it was in Mathis's possession.

The State argued that Richards was an accomplice to the murder. The jury was instructed that a person who is an accomplice in the commission of a crime "is guilty of

that crime whether present at the scene or not." RP at 2038 (Instruction 7). Based on the evidence at trial, the court instructed the jury not only on the charged crimes, but also on lesser included crimes of second degree murder and second degree felony murder.

The jury found Richards guilty of second degree felony murder and first degree manslaughter. It returned special verdicts that he had been armed with a deadly weapon at the time of the crimes. The parties' appeals were originally consolidated but were later severed.

## ANALYSIS

Richards assigns error on appeal to the trial court's (1) failure to sever his case from the prosecution of Mathis, (2) denial of his motion to suppress,[3] (3) admitting out-of-court statements made by an alleged coconspirator as exceptions to the hearsay rule, (4) admitting evidence of Richards's drug use and dealing, and (5) erroneously instructing jurors that they must be unanimous to answer "no" to the deadly weapon special verdict forms.[4]

The last assignment of error is readily addressed. Richards raised it before the Washington Supreme Court decided *State v. Guzman Nuñez*, 174 Wn.2d 707, 285 P.3d

---

[3] Richards's brief makes two assignments of error to denial of the motion to suppress that we address together.

[4] Richards argues alternatively that cumulative error denied him a fair trial. In light of our disposition of his assignments of error, the argument of cumulative error necessarily fails.

21 (2012), in which it overruled two prior decisions[5] and found that the pattern jury instruction used below correctly stated the law. There was no error.

We address the remaining assignments of error in turn.

## I. Refusal to Sever/Speedy Trial

Richards first assigns error to the trial court's refusal to sever his and Mathis's trials when her request for a continuance delayed trial, thereby allegedly depriving him of his right to a speedy trial.

The trial was continued several times. The first continuance was requested by the State in early November 2009. Richards opposed the continuance, although his lawyer admitted that his witness list and investigation were not yet completed. The court granted the State's motion, finding the continuance was necessary in the interests of justice for reasons stated on the record. It continued the trial date to January 12, 2010 and, taking the continuance into account, recalculated the allowable time for trial under CrR 3.3 as continuing until February 11.

In early January, Mathis moved to continue trial until March after learning that DNA (deoxyribonucleic acid) testing in response to a request by the State did not include paternity testing on Ms. Kitterman's unborn child. She also expressed concern that her experts were not yet prepared to respond to the State's evidence. Richards opposed the

---

[5] *State v. Bashaw*, 169 Wn.2d 133, 234 P.3d 195 (2010) and *State v. Goldberg*, 149 Wn.2d 888, 72 P.3d 1083 (2003).

continuance. The State refused to support any continuance if it would mean a severance of the Mathis and Richards trials. The court granted a one-month continuance to February 9, a date still within the allowable time for trial under criminal rules. Richards acknowledged that he could identify no prejudice from the short continuance.

Mathis soon filed a motion to revise the early January ruling, again seeking a two-month continuance based on a new disclosure by the State of third parties who would testify that they had felt Kitterman's unborn child kick, in support of an element of the manslaughter charge. Mathis's lawyer argued that given the 11-week gestation period the testimony was implausible, yet Mathis needed time to get an expert witness to discredit the testimony. The State, still resisting severance of the Mathis and Richards trials, argued that if a continuance was granted, Richards's case should also be continued.

Richards again opposed the continuance, citing, as prejudice, witnesses' fading memories. The court nonetheless granted the further continuance, finding, among other supporting facts, "Richards has shown no specific prejudice to the presentation of his defense if a continuance is granted," "The State intends to call in excess of 50 witnesses at trial," "A visiting judge is required to hear this case," and "[Due] to the nature of the charges a large jury pool will need to be called for voir dire." Clerk's Papers (CP) at 322. Among its conclusions were, "Judicial economy outweighs Defendant Richards['s] speedy trial date" and, "A continuance is necessary for the administration of [j]ustice."

9

*Id.* Because a March trial date would not work for the State, the court set trial to begin April 6. The trial proceeded as scheduled in April.

The granting or denial of a motion for separate trials of jointly charged defendants is entrusted to the discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion. *State v. Hoffman*, 116 Wn.2d 51, 74, 804 P.2d 577 (1991) (citing *State v. Grisby*, 97 Wn.2d 493, 507, 647 P.2d 6 (1982)). "Separate trials are not favored in Washington and defendants seeking severance have the burden of demonstrating that a joint trial would be so manifestly prejudicial as to outweigh the concern for judicial economy." *Id.* (citing *State v. Philips*, 108 Wn.2d 627, 640, 741 P.2d 24 (1987)).

A codefendant's right to a speedy trial can present manifest prejudice. Article I, section 22 of the Washington Constitution and the Sixth Amendment to the United States Constitution both guarantee a criminal defendant the right to a speedy public trial. *State v. Iniguez*, 167 Wn.2d 273, 290, 217 P.3d 768 (2009). By court rule, the State has 60 days to bring a defendant to trial, but that 60-day period does not purport to be the constitutionally required limitation. CrR 3.3(b)(1); *State v. Terrovona*, 105 Wn.2d 632, 651, 716 P.2d 295 (1986). A trial court may grant a continuance under CrR 3.3(f)(2) when a continuance is "required in the administration of justice" and the "defendant will not be prejudiced in the presentation of his or her defense." Such continuances are then excluded in computing the allowable time for trial. CrR 3.3(b)(5).

10

Richards cites *State v. Torres*, 111 Wn. App. 323, 332, 44 P.3d 903 (2002) for the proposition that "[a]s a general rule, the court should sever to protect a defendant's right to a speedy trial." *Torres* was speaking of severance requested "[w]hen speedy trial and consolidation considerations collide," however. *Id.* It recognized that "the court *may* proceed with a joint trial, particularly where neither defendant alleges any prejudice in presenting a defense" and "[s]everance is not mandatory, except to protect one defendant from incriminating out-of-court statements by another." *Id.*; *see State v. Dent*, 123 Wn.2d 467, 484, 869 P.2d 392 (1994) ("'Severance is not mandatory even where a defendant's speedy trial rights are at issue'" (quoting *State v. Melton*, 63 Wn. App. 63, 67, 817 P.2d 413 (1991))). A defendant requesting severance must be able to point to specific prejudice. *State v. Sublett*, 176 Wn.2d 58, 69, 292 P.3d 715 (2012). He may not rely upon any presumption of prejudice by mere lapse of time. *State v. Valentine*, 20 Wn. App. 511, 514, 580 P.2d 1119 (1978).

Richards failed to point to any specific prejudice. The trial court did not abuse its discretion in refusing to sever the cases when it granted Mathis's motion to continue the trial date.

## II. Motion to Suppress

Before trial, the State identified a number of statements by Richards that it intended to offer at trial; they included statements he had made on the day he was arrested on the outstanding warrant for failure to pay fines and taken by detectives to the

11

Spokane police department for questioning as a witness. The statements made by

Richards on that date were treated by the court as falling into three categories. The first

category was the statements Richards made when he was initially taken to an interview

room; they concluded with his announcement a couple of hours later that he did not want

to be a snitch. The second was his allegedly spontaneous statement when being escorted

to the jail to be booked, that he would talk and "Hollywood did it." The third was the

formal statement he provided following *Miranda* warnings after he was taken back to the

interview room.

The trial court granted Richards's motion to suppress the statements made during

the first couple of hours following his arrival at the Spokane police department. While

the State argues that Richards had not been "formally placed under arrest" and was "not

. . . a suspect, but . . . a witness," Br. of Resp't at 37, the trial court found that he had been

arrested on the outstanding warrant at his home, placed in handcuffs, placed in a police

vehicle and transported to the police department, and concluded that he was in custody

and interrogated for purposes of *Miranda* yet was not read his constitutional rights.

*Miranda* did not make a distinction between "suspects" and "witnesses": it recognized

that "when an individual is taken into custody or otherwise deprived of his freedom by

authorities in any significant way and is subjected to questioning, the privilege against

self-incrimination is jeopardized." 384 U.S. at 478; *and see Mathis v. United States*, 391

U.S. 1, 88 S. Ct. 1503, 20 L. Ed. 2d 381 (1968) (*Miranda* warnings are necessary even if

12

police are questioning a defendant about an offense different from that for which the defendant is in custody).

The trial court denied the motion to suppress statements in the second and third categories, finding that Richards's statement, "Hollywood did it," made as he approached the jail, was spontaneous and voluntary and that the statement he provided following *Miranda* warnings was made following a knowing, intelligent, and voluntary waiver of his rights. Richards challenges the trial court's denial of his motion to suppress his second statement on the basis that the statement was coerced. He challenges the court's denial of his motion to suppress his third, formal statement on the basis that he invoked his constitutional rights and should not have been questioned further.

## A. "Hollywood Did It"

The trial court entered the following two findings and one conclusion supporting its denial of the motion to suppress the second statement challenged by Richards's motion to suppress:

> [Finding] 7.  . . . [S]ometime after the first interview ended, the defendant was being transported to the Spokane County Jail by [a detective] on the unrelated warrant.
> [Finding] 8.  Prior to arriving at the jail, the defendant spontaneously and voluntarily stated "I will tell you what I know, I will talk, Hollywood did it."
>  . . . .
> [Conclusion] 3.  The second statement by the defendant . . . was spontaneous and freely and voluntarily given and is therefore admissible at trial.

13

CP at 833-35.

We review a trial court's findings of fact following a CrR 3.5 hearing for substantial evidence and review de novo whether the trial court's factual findings support its conclusions of law. *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). Substantial evidence is that which is sufficient to persuade "'an unprejudiced, thinking mind of the truth of the fact to which the evidence is direct.'" *State v. Summers*, 107 Wn. App. 373, 388, 28 P.3d 780, 43 P.3d 526 (2001) (quoting *State v. Hutton*, 7 Wn. App. 726, 728, 502 P.2d 1037 (1972)).

Richards contends that the trial court's finding that his statement was spontaneous and voluntary was not supported by substantial evidence, arguing that voluntariness was contradicted by the following facts admitted by the State's witnesses:

> Police informed Richards that if he cooperated with their request to interview him, they would let him take care of his warrant on his own.
>
> Richards was not initially advised of his *Miranda* rights.
>
> The officers concluded the interview when Richards stated that he did not want to be a snitch, and began walking him to the jail to book him on the warrant.
>
> The police continued to converse with Richards on the walk to the jail, stating, "We consider you a witness and we'd like you to talk to us."
>
> As they approached the jail, Richards made the statement that Hollywood did it.

*See* Br. of Appellant at 24-25 (citing RP at 276-79).

A suspect who is in custody but who is not being "interrogated" does not have *Miranda* rights. *State v. Warness*, 77 Wn. App. 636, 639-40, 893 P.2d 665 (1995).

14

"Interrogation" is broad enough to include express questioning and its functional equivalent, which the United States Supreme Court has defined as "'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *State v. Wilson*, 144 Wn. App. 166, 184, 181 P.3d 887 (2008) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980)). The State argues that the requirement that police anticipate an "incriminating" response is not met here, where Richards was not a suspect, but *Innis* and *Miranda* define "incriminating" broadly. As explained in *Innis*:

> By "incriminating response" we refer to any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial. As the Court observed in *Miranda*:
>> No distinction can be drawn between statements which are direct confessions and statements which amount to "admission" of part or all of an offense. The privilege against self-incrimination protects the individual from being compelled to incriminate himself in any manner; it does not distinguish degrees of incrimination. Similarly, for precisely the same reason, no distinction may be drawn between inculpatory statements and statements alleged to be merely "exculpatory." If a statement made were in fact truly exculpatory it would, of course, never be used by the prosecution. In fact, statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given under interrogation and thus to prove guilt by implication. These statements are incriminating in any meaningful sense of the word and may not be used without the full warnings and effective waiver required for any other statement. 384 U.S. at 476-477.

446 U.S. at 301 n.5.

15

"As *Miranda* clearly indicates, 'interrogation' encompasses much more than mere question-answer sessions; often the more successful techniques include psychological tactics and patient maneuverings designed to undermine the suspect's will to resist." *State v. Boggs*, 16 Wn. App. 682, 685, 559 P.2d 11 (1977). Any custodial statement is suspect and the burden is upon the State to demonstrate that such a statement was "volunteered" in the *Miranda* sense, i.e., that it was spontaneous and not prompted by questioning or other action calculated to elicit response. *Id.* at 685-86 (citing *State v. Toliver*, 6 Wn. App. 531, 494 P.2d 514 (1972)). The determination of voluntariness is made upon the totality of circumstances surrounding the interrogation. *State v. Unga*, 165 Wn.2d 95, 100, 196 P.3d 645 (2008) (quoting *Fare v. Michael C.*, 442 U.S. 707, 724-25, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)). We will not overturn the trial court's determination that statements were voluntarily or spontaneously made if substantial evidence in the record supports this conclusion. *State v. Aten*, 130 Wn.2d 640, 664, 927 P.2d 210 (1996).

A promise by police of a benefit if an individual agrees to provide information is potentially coercive; if it proves coercive, then information provided in response is done so involuntarily and must be suppressed. As summarized in *Unga*, 165 Wn.2d at 108:

> "That a law enforcement officer promises something to a person suspected of a crime in exchange for the person's speaking about the crime does not automatically render inadmissible any statement obtained as a result of that promise." [*United States v.*] *Walton*, 10 F.3d [1024,] 1028 [3d Cir. 1993]. "The promise must be sufficiently compelling to overbear the suspect's will

16

in light of all attendant circumstances." [*United States v.*] *Gurrero*, 847 F.2d [1363,] 1366 [9th Cir. 1988].

Events leading to this second statement raise an issue of a promised benefit as coercion: detectives promised not to book Richards in exchange for cooperation; he was detained for two hours without providing information, ultimately announcing that he did not want to be a snitch; and the detectives then delivered on the threat implied by their offer by walking him to jail, reminding him, en route, "'You're a witness,' and 'We consider you a witness and we'd like you to talk to us.'" RP at 279. The only reasonable conclusion is that when Richards relented on the jailhouse steps it was the result of his imminent booking, not some spontaneous, unrelated change of heart. But as our Supreme Court has pointed out, the causal connection between police conduct and a detainee's decision to speak required to make a statement involuntary is not "but for" causation; rather, "'[t]he question [is] whether [the interrogating officer's] statements were so manipulative or coercive that they deprived [the suspect] of his ability to make an unconstrained, autonomous decision to confess.'" *Unga*, 165 Wn.2d at 102 (most alterations in original) (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986)).

In initially announcing its findings and conclusions on the admissibility of this second statement, the trial court considered only the words exchanged between the detectives and Richards as they arrived at the jail, and observed that "[a] person can say whatever they want to. The police don't have any control over that." RP at 341. No

17

No. 29075-1-III
*State v. Richards*

consideration was given at that point to the coercive effect of a contingently promised benefit that the detectives were about to withhold. But before the trial court's oral ruling, Richards had not argued that these were coercive circumstances.

Notably, when the State later asked the court to make an explicit finding that the detectives never used threats or coercion,[6] the trial court pointed to the potentially coercive effect of the promised benefit, observing:

> [T]he timing of Mr. Richards' statement, "Okay, I'll talk,"—
>
>   . . . .
>
>     . . . is right as he's being taken to the steps of the jail. And—and let's face it; that, by itself, is, for most people, anyway—quite coercive. And most people, I think, would feel like, "Okay, I gotta do this if I want to avoid jail,"—and, in fact, the—the officers—stuck to their word and they let him go.
>     So it was only after he talked to them that they let him go. So it's sort of self-proving that the threat of jail in effect was coercive.

RP at 354. The court therefore refused to make the finding requested by the State. But it did not revisit its decision to admit the second statement.

The trial court was not presented with any evidence as to how onerous being booked would have been for Richards, in light of his circumstances. Given that, the court's belated recognition of potential coercion, and the State's burden of proof, we cannot say that the trial court's findings of fact support its conclusion that the second

---

[6] The State argued that the finding would entitle it to use all of Richards's statements, even those suppressed, for impeachment.

18

statement was admissible. We have no problem concluding that the error in admitting this second statement was harmless, however.

Admission of a statement obtained in violation of *Miranda* can be harmless. *State v. Reuben*, 62 Wn. App. 620, 814 P.2d 1177 (1991). A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). Under the "overwhelming untainted evidence" test employed in Washington, we look at only the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *Id.* at 426.

Detectives had been led to Richards's residence by information that Mathis and Phillips, already suspects, had traveled there following the murder. The detectives did not view either this second statement or Richards's third, formal statement as suggesting that Richards was anything other than a witness, as evidenced by the fact that they let him leave the station at the conclusion of the interview. As compared to the State's other properly admitted evidence, this second statement by Richards was inconsequential. The exclusion of the statement would not have resulted in a different verdict.

### B. Waiver of *Miranda* Rights

The trial court entered the following key findings supporting its denial of the motion to suppress Richards's third, formal statement:

10. The defendant was advised of his constitutional rights in their entirety by Detective [Kip] Hollenbeck. The defendant signed the rights card indicating he understood the rights and wanted to give up his rights and answer questions. (see exhibit #4)

11. The defendant, at some point, stated to Detective Hollenbeck that he did not want to give up his rights but he wanted to talk. There was no request for a lawyer to be present.

12. The defendant was then contacted by Detective [Mike] Murray who again advised him of his constitutional rights.

13. The defendant stated he understood those rights and wanted to talk to the Detectives.

14. The defendant understood these rights and knowingly, intelligently and voluntarily waived these rights.

CP at 834. Richards assigns error to only finding 14. Citing the finding that he told Detective Hollenbeck that he did not want to give up his rights, he argues that "[w]hen an individual in any manner and at any time invokes his or her right to remain silent, police must cease questioning." Br. of Appellant at 26 (citing *State v. Walker*, 129 Wn. App. 258, 273-74, 118 P.3d 935 (2005)).

Richards recognizes that the invocation of the right to remain silent or the right to counsel "'must be clear and unequivocal (whether through silence or articulation) in order to be effectual,' and authorities do not have to ask clarifying questions in response to unclear and equivocal statements." *Id.* (quoting *Walker*, 129 Wn. App. at 276; citing *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010)). He argues that his statement that he "did not want to give up his rights" was unequivocal, relying on *State v. Grieb*, 52 Wn. App. 573, 761 P.2d 970 (1988).

20

*Grieb* involved substantially similar statements made by the defendant when being read his rights ("'I don't wanna waive my rights'" but "'I'll talk to ya'"). *Id.* at 574. But the context in which the defendant made and repeated his objections in *Grieb* was contextually different and the case was in a materially different posture on appeal. In *Grieb*, a transcript of the conversation between the defendant and the questioning officers revealed four times during the reading of the defendant's rights that he stated he did not want to waive his rights or "'do anything that's gonna waiver of my . . . waive my rights.'" *Id.* (alteration in original). The defendant also said the he *would* talk to the officers but did not say that he *wanted* to. The trial court found that the defendant did not understand his *Miranda* rights and suppressed his statement. It was the State that was appealing.

Here, the Spokane detective involved in questioning Richards (Detective Hollenbeck) testified at the suppression hearing that "[Richards] indicated that he wanted to talk to us. It was clear that he was nervous about talking to us, but he—he wanted to talk to us." RP at 281. He continued:

> A. I told him that he had a right to refuse to answer any questions, and that it was my understanding, based on our conversation outside the jail, that he wanted to talk to Det. Murray.
> Q. Did he respond?
> A. He did. He said that—he adamantly denied being involved in the murder, and agreed that he was only a witness. He then agreed to continue the interview. He was then readvised of his constitutional rights.

RP at 282. Detective Murray of the Okanogan County sheriff's office joined Detective Hollenbeck and Richards in the interview after Richards had already made his single, equivocal statement about not wanting to waive his rights. Detective Murray readministered the *Miranda* warnings and taped his interview, in which Richards said nothing about not wanting to waive his rights.

The State bears the burden of showing by a preponderance of the evidence that a waiver of *Miranda* rights was knowing, voluntary, and intelligent. *State v. Athan*, 160 Wn.2d 354, 380, 158 P.3d 27 (2007). A trial court's determination that a defendant's statements were made voluntarily will not be disturbed on appeal if there is substantial evidence in the record to support it. *State v. Cushing*, 68 Wn. App. 388, 393, 842 P.2d 1035 (1993). A signed waiver form alone is strong (although not sufficient) evidence to prove waiver. *State v. Bledsoe*, 33 Wn. App. 720, 725, 658 P.2d 674 (1983) (citing *State v. Vannoy*, 25 Wn. App. 464, 470, 610 P.2d 380 (1980)).

Richards's single equivocal statement that he did not want to waive his rights but would talk to the detectives was only one piece of evidence before the court. Other evidence included the two administrations of *Miranda* warnings; his signed waiver card; and the testimony of two detectives who understood that Richards, having been read his rights, wanted to provide his exculpatory statement. Substantial evidence supports the trial court's denial of Richards's motion to suppress his third, formal statement.

### III. Admission of Statements of Coconspirator

A pretrial motion in limine filed by the State put the trial court and the defendants on notice that the State would seek to offer hearsay statements that it contended were admissible because they were in furtherance of a conspiracy. An out-of-court assertion offered for the truth of the matter asserted is not hearsay if offered against a party and made by a coconspirator of that party "during the course and in furtherance of the conspiracy." ER 801(d)(2)(v). Richards assigns error to the trial court's admission of such statements recounted by three witnesses arguing that the State did not establish that he was a party to a conspiracy to murder and that the statements admitted were not in furtherance of a conspiracy.

We first consider Richards's argument that the State did not demonstrate his participation in a conspiracy. Before admitting hearsay evidence of statements by an alleged coconspirator, the trial court must first find, "with substantial independent evidence, a prima facie case of conspiracy" and at least slight evidence of the defendant's participation. *State v. Dictado*, 102 Wn.2d 277, 283-84, 687 P.2d 172 (1984), *abrogation on other grounds recognized in State v. Short*, 113 Wn.2d 35, 40, 775 P.2d 458 (1989). Conspiracy is seldom susceptible of direct and positive evidence, *id.*, and the State may prove an illegal agreement giving rise to a conspiracy by circumstantial evidence, including by overt acts alone. *State v. Gallagher*, 15 Wn. App. 267, 277, 549 P.2d 499 (1976). No formal agreement need be shown. *State v. Barnes*, 85 Wn. App. 638, 664,

23

932 P.2d 669 (1997). The evidence of the conspiracy must be independent of the statements themselves. *Guloy*, 104 Wn.2d at 420. The determination of whether a prima facie case exists is for the trial court in the exercise of its discretion. *State v. Culver*, 36 Wn. App. 524, 528, 675 P.2d 622 (1984).

The State need not charge the crime of conspiracy to admit out-of-court statements of a defendant's coconspirators and need not meet technical requirements for proving the crime of conspiracy. *State v. Halley*, 77 Wn. App. 149, 153-54, 890 P.2d 511 (1995). To admit a statement under ER 801(d)(2)(v), the State "need establish no more than the basic dictionary definition of a conspiracy, 'an agreement . . . made by two or more persons confederating to do an unlawful act', *Webster's Third New International Dictionary* 485 (1969), regardless of the crime charged." *Id.* at 154 (alteration in original).

Here, the trial court heard argument from the lawyers about the availability of the exception before admitting the challenged hearsay. It ruled, "I think we've got prima facie on a co-conspirator," but without explaining the basis for its finding. RP at 953. We can nonetheless affirm admission of such statements without an independent trial court determination if the record provides "substantial evidence" of the conspiracy. *See Guloy*, 104 Wn.2d at 420.

Here, there was substantial evidence of Richards's participation in a plan to "tax a snitch" through assault and intimidation, at a minimum. There was testimony from Richards's friend that before the road trip, Richards learned that the plan was to

24

intimidate a pregnant woman to the point of abortion; it was allegedly for that reason that Richards, without withdrawing from the plan, stayed in Spokane and let his "tax man" take the road trip. Phillips testified to how Richards pressed him, after the murder, to talk about what had happened and acted disappointed at the amount of methamphetamine provided in payment. And while Phillips claims not to have provided Richards with details of what had happened, Richards evidently knew, since he later told detectives that Phillips stabbed Kitterman. There was sufficient evidence of a conspiracy in which Richards had some participation to satisfy that part of the foundation for admission.

Turning to Richards's argument that the statements admitted were not in furtherance of a conspiracy, we begin by recognizing that courts interpret the "in furtherance" requirement broadly. *State v. Baruso*, 72 Wn. App. 603, 615, 865 P.2d 512 (1993). A statement meets the requirement if it is meant to induce further participation in the conspiracy or to inform a coconspirator about the status of the conspiracy. *State v. King*, 113 Wn. App. 243, 280, 54 P.3d 1218 (2002) (citing *United State v. Herrero*, 893 F.2d 1512, 1527 (7th Cir. 1990)). On the other hand, casual, retrospective statements about past events do not fall within the coconspirator exception because they do not further the conspiracy. *Id.* at 281 (citing *Baruso*, 72 Wn. App. at 614-15).

The State's brief does not include argument as to how Hirst's statements admitted as hearsay were in furtherance of the conspiracy. The damaging content of the challenged testimony was Hirst's contemporaneous admission to third parties not

involved in the conspiracy of the criminal (or, at a minimum tortious) harm to Kitterman that she and others had planned.[7] Her statements are not typical of the statements usually examined for admission under ER 804(b)(3). It is difficult to see how they advanced the object of the conspiracy.

They are also unusually reckless, and the State relies on that to argue that even if the statements were not admissible under the coconspirator exception, they were admissible as statements against interest. Under ER 804(b)(3), a hearsay statement that, at the time of its making, "so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true" is an exception to the hearsay rule if

---

[7] Richards challenges the admission of testimony by one witness that Hirst told her boyfriend prior to the murder that "it would all be taken care of by Monday [and] that everything should be back to normal." RP at 992.

He challenges the admission of testimony by a second witness, Hirst's co-worker, who stated that Hirst made comments about the individual her husband was having an affair with and would say "[a]nything from she was going to find a way to have her thrown in jail, she was going to have her arrested, she was—going to—she was going to find some way to—to get her out of their lives. Several occasions she made—direct threats . . . . She stated on several occasions that she was going to have her taken care of, she was going to have her eliminated, removed, disappear. . . . She said that she had some—she knew some people in Spokane that were going to come take care of it for her." RP at 1016-17.

He challenges the admission of testimony by a third witness, Hirst's friend, who testified that "[Lacey] hated Michelle because she was with Danny [Pavek]. . . . She told me she had four people—she had hired to take care of Michelle and the unborn child. . . . She said she was going to go out one night, when Danny's home, at her house, and she's going to—drug him—that night he was to meet Michelle, so he wouldn't go and meet her, so he's going to—she was going to drug him." RP at 1031-32.

26

the declarant is unavailable as a witness. This exception was relied upon in the trial court

as an additional basis for admitting some of Hirst's statements to third parties. The State

established Hirst's unavailability by questioning her lawyer, who confirmed to the court

that Hirst (whose case had not proceeded to trial at the time Mathis's and Richards's case

was tried) would exercise her constitutional right to remain silent if she were called as a

witness.[8]

Richards does not address this alternative basis for admission by reply.

We may affirm the trial court's ruling admitting evidence on any basis that the

record supports. *State v. Norlin*, 134 Wn.2d 570, 582, 951 P.2d 1131 (1998). We agree

with the State that the three statements by Hirst offered through third parties were all

statements against interest and admissible on that basis.

### IV.  ER 404(b) Evidence

The State's pretrial motion in limine also disclosed that it sought to introduce

evidence of drug transactions by Richards under ER 404(b), arguing that "drug

transactions were interwoven and pervasive throughout the lead up and commission of

the crime." CP at 769. For his part, Richards moved for an order in limine excluding any

evidence of prior bad acts. In ruling on the motions, the trial court expressed its view that

---

[8] The State points out that Richards's right to confrontation is not implicated by Hirst's statements, which were made before the crime; to lay witnesses, not law enforcement; and are not remotely "testimonial" within the meaning of *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

some drug evidence would prove admissible on the res gestae basis argued by the State

but—critically for purposes of this argument on appeal—it reserved ruling on any

particular evidence. Instead, it instructed the defendants to object as appropriate:

> THE COURT: . . . I don't want the state to beat the drug drum
> needlessly. I mean, it sounds like it is, at least in the state's theory of the
> case, it's part of their case in chief, but you can't use it to inflame the jury, I
> guess is what I'm saying.
> MR. SLOAN: We understand that.
> THE COURT: So I think what I should do on [motion in limine
> number] 6 is reserve, with everyone knowing that, okay, we just want the
> bare minimum of that put in, and if—and if defense counsel thinks they're
> going beyond the bare minimum, they're starting to beat that drug drum,
> then make your objection and we'll go from there.

RP at 437-38.

Richards contends the trial court "abdicated its responsibility as the gatekeeper"

by failing to conduct an examination of the State's evidence of Richards's drug

involvement. Br. of Appellant at 37. But he fails to demonstrate where he made an

objection to specific evidence or argument on which the trial court would then rule. He

provides only two citations to the record in support of this assignment of error: one is to

the opening statement of the State and the other is to the opening statement of his

codefendant, Mathis. Richards did not object at either point in the proceedings to which

he draws our attention on appeal.

Our Supreme Court "has 'steadfastly adhered to the rule that a litigant cannot

remain silent as to claimed error during trial and later, for the first time, urge objections

28

thereto on appeal.'" *Guloy*, 104 Wn.2d at 421 (quoting *Bellevue Sch. Dist. No. 405 v. Lee*, 70 Wn.2d 947, 950, 425 P.2d 902 (1967)). Richards waived any objection under ER 404(b).[9]

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds, Richards raises four. He asserts that the trial court erred by (1) depriving him of his right to a speedy trial by the continuances granted to Mathis and (2) denying his request to change venue, (3) that no evidence was presented that Richards was in possession of a deadly weapon, and (4) that the trial court miscalculated his offender score by including juvenile convictions. The speedy trial issue was adequately addressed by counsel and will not be reviewed again. RAP 10.10(a). We address the remaining three issues raised in turn.

*Change of Venue.* Both Mathis and Richards moved for a change of venue based on extensive pretrial publicity. The court denied the motion.

When a defendant shows that pretrial publicity has created a probability of unfairness or prejudice, a presumption arises that courts should reject claims by potential jurors that they can be impartial. *State v. Jackson*, 150 Wn.2d 251, 269, 76 P.3d 217

___

[9] In this section of his brief, Richards also makes a passing complaint about the State's evidence that Richards was known to carry knives around, including an ice pick. The argument is unsupported by references to any relevant part of the record, in violation of our rules. RAP 10.3(a)(6). We will not search the record to locate the portions relevant to a litigant's argument. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 819, 828 P.2d 549 (1992).

(2003). Courts must examine the totality of the circumstances to determine whether the probability of unfairness or prejudice has been shown. Whether the community remembers the crime is not the issue; rather, the relevant inquiry is whether the jurors have such fixed opinions that they cannot judge impartially the guilt of the defendant. *See id.* "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961).

A trial court's decision to deny a motion for change of venue is reviewed for abuse of discretion. *Jackson*, 150 Wn.2d at 269. We independently review the record to determine whether the probability of prejudice is so apparent that it was error to deny the motion. *State v. Thompson*, 60 Wn. App. 662, 669, 806 P.2d 1251 (1991). We examine nine nonexclusive factors to determine whether the trial court abused its discretion:

> "(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn."

*Id.* at 669 (quoting *State v. Laureano*, 101 Wn.2d 745, 756-57, 682 P.2d 889 (1984),

*overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988),

*adhered to on recons.*, 113 Wn.2d 520, 782 P.2d 1013, 787 P.2d 906 (1989)).

In this case, the trial court thoroughly considered the *Jackson* factors before

deciding, prior to voir dire, "at this time . . . to deny the motion to change venue without

prejudice." RP at 401. The court went on to say that if, following voir dire, the court and

the parties were "unable to find fifteen or sixteen folks to hear this case, then you're

certainly able to renew that motion at that time." *Id.* A jury was selected and there is no

indication in the record that the motion was ever renewed. Richards has not shown an

abuse of discretion by the court.

*Sufficiency of Evidence For Deadly Weapon Enhancement.* Richards next argues

that the jury found him "armed with a deadly weapon" even though no evidence was

presented that he was in possession of a weapon when the crimes for which he was

convicted took place.

RCW 9.94A.825 provides that "[i]n a criminal case wherein there has been a

special allegation and evidence establishing that the accused *or an accomplice* was armed

with a deadly weapon at the time of the commission of the crime, . . . the jury shall, if it

find[s] the defendant guilty, also find a special verdict as to whether or not the defendant

*or an accomplice* was armed with a deadly weapon at the time of the commission of the

crime." (Emphasis added; third alteration in original.) Where the jury makes the finding,

31

RCW 9.94A.533(4) provides that additional time "shall be added to the standard sentence range."

Richards's argument may be based in part on the form of the special verdict used in his case, which asked only if "the defendant David Eugene Richards [was] armed with a deadly weapon at the time of the commission" of the several charged crimes. CP at 632. But the court had instructed the jury that for purposes of the special verdict, "If one person is armed with a deadly weapon, all accomplices are deemed to be so armed, even if only one deadly weapon is involved." CP at 631. Given this instruction, substantial evidence supported the special verdict finding that Richards was armed with a deadly weapon.

*Offender Score.* Richards's offender score used in arriving at his sentence was four points, three of which were attributable to crimes committed when he was a juvenile. Richards contends that his juvenile crimes should have been "washed out" or counted as half points. He cites no legal authority for his position and may be relying on an understanding of former law. A sentencing court's calculation of a defendant's offender score is a question of law and is reviewed de novo. *State v. McCraw*, 127 Wn.2d 281, 289, 898 P.2d 838 (1995).

A defendant's criminal history lists both prior convictions and juvenile adjudications. Former RCW 9.94A.030(14) (2008). "Criminal history" is a defined term in the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW. *Id.* A decision

32

whether a prior conviction shall be included in an individual's offender score is determined by the law in effect on the day the current offense was committed. *State v. Varga*, 151 Wn.2d 179, 189, 86 P.3d 139 (2004). Richards's current offenses were committed in March 2009.

Since its amendment in 2002, the SRA has provided that all prior juvenile adjudications are included in a defendant's criminal history unless they have been vacated. Former RCW 9.94A.030(13) (2002). An offender has no vested right in the definition of "criminal history" that was in effect at the time he acquires his history. *In re Pers. Restraint of LaChapelle*, 153 Wn.2d 1, 12, 100 P.3d 805 (2004). In particular, a defendant convicted of a crime committed after the 2002 amendment of the definition of "criminal history" has no vested right to have his pre-2002 juvenile convictions disregarded. *State v. McDougall*, 132 Wn. App. 609, 614, 132 P.3d 786 (2006).

Turning to the trial court's calculation of Richards's offender score of four, we look to RCW 9.94A.525(9), which provides the numerical scores for offenses. The statute provides that if a defendant's present conviction is for a serious violent offense, "count three points for prior adult and juvenile convictions for crimes in this category, two points for each prior adult and juvenile violent conviction (not already counted), one point for each prior adult nonviolent felony conviction, and 1/2 point for each prior juvenile nonviolent felony conviction." RCW 9.94A.525(9).

33

No. 29075-1-III
*State v. Richards*

The trial court's calculation of an offender score of four for Richards was based on an adult conviction for malicious mischief in the first degree, for one point; and on juvenile convictions of child rape in the first degree, for two points, incest in the first degree, for one-half point, and incest in the second degree, for one-half point. There was no error.

Affirmed.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Brown, J.

_____
Kulik, J.

34